**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ABRAHAM CALDERON, | |
| Plaintiff, | |
| v. | Case No.: 1:2018-cv-08277 |
| VILLAGE OF BRIDGEVIEW, ILLINOIS POLICE OFFICER, C. PELL; MARK KRAFT; JESSE ORTIZ; MONTERREY SECURITY CONSULTANTS, INC.; DANIEL NESIS; TERRY THOMPSON; CESAR PEREZ; NELSON C. RODRIGUEZ; MIKE BUBACZ; and GENEVIEVE MARIE LEFEVOUR, | JURY TRIAL DEMANDED |
| Defendants. | |

**THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS**

NOW COMES Plaintiff ABRAHAM CALDERON, by and through his attorney, James C. Vlahakis, and pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 1986 and various state law claims, asserts the following against Defendants:

**Introduction, Jurisdiction and Venue**

1.      ABRAHAM CALDERON ("Plaintiff") is a resident of the Northern District of Illinois and is of Hispanic origin, with his origins going back to the Zacatecas and Jalisco regions of Mexico.

2.      Chicago Fire Soccer Club is a professional soccer team that plays soccer matches at Toyota Park (now referred to as Seat Geek Stadium[1]), which is located the Village of Bridgeview, Illinois.  The Village Bridgeview is the owner of Toyota Park, a multi-purpose stadium that is located within the Village of Bridgeview.

3.      Defendant MONTERREY SECURITY CONSULTANTS, INC. ("Monterrey

---

[1] Plaintiff will refer to the site of the incident in question by its former name, Toyota Park.

Security") is a corporate entity that conducts business within the borders of the Northern District of Illinois.

4.    Monterrey Security provides security for events held at Toyota Park.

5.    Monterrey Security contracts with the Village of Bridgeview to provide security for Chicago Fire matches and Monterrey did so on May 20, 2018.  Alternatively, a company known as Spectra, an affiliate or subsidiary of Comcast Spectacor, LLC, manages the day-to-day operation of Toyota Park on behalf of the Village of Bridgeview, and contracts with Monterrey Security to provide security for Toyota Park.

6.    All of the Individual Defendants reside in the Northern District of Illinois, with the exception of Defendant NELSON C. RODRIGUEZ ("Defendant Rodriguez") who purportedly resides in the Northside of Chicago during weekdays and returns to stay with his family in New Jersey (on non-game day weekends).

7.    All of the complained of acts of misconduct occurred within this District.

8.    Federal jurisdiction exists and is predicated on claims arising pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985(3) and 1986.

9.    On May 20, 2018, Plaintiff attended a Chicago Fire match between Chicago Fire and Houston Dynamo, at Toyota Park.

10.    After the conclusion of the match, while Plaintiff was lawfully walking through the eastern parking lot of Toyota Park, he encountered Defendants JESSE ORTIZ ("Ortiz" or "Defendant Ortiz") and DANIEL NESIS ("Nesis" or "Defendant Nesis").

11.    On May 20, 2018, Ortiz and Nesis were employees of Monterrey Security.

12.    During this time period, Defendants Ortiz and Nesis were also employed in law enforcement as full-time occupations.

13.    All of the Defendants knew that Defendants Nesis and Ortiz were employed in law enforcement during the events in question.

2

14.     Defendants Ortiz and Nesis interacted with Plaintiff on May 20, 2018, moments before a post-match incident that took place between fans of the Chicago Fire and fans of the Chicago Fire's opponent, Houston Dynamo (the "Post-Game Incident").

15.     As detailed below, Defendants Ortiz and Nesis conspired to falsely accuse Plaintiff of battering Ortiz despite the existence of security camera video footage and cellphone videos documenting that Plaintiff *did not* batter Defendant Ortiz, Defendants Ortiz, Nesis and certain other Defendants conspired to wrongfully convict Plaintiff for a crime that he did not commit.

16.     In part, Defendants Ortiz and Nesis sought to convict Plaintiff for a crime that he did not committee because they harbor animosity and ill will toward Plaintiff based upon an incident that took place at Toyota Park during the course of "meet the team" autograph event on or September 9, 2017.

17.     As detailed below, Defendant Ortiz concocted a false claim of battery and reported his false accusation to Defendant VILLAGE OF BRIDGEVIEW, ILLINOIS, POLICE OFFICER C. PELL ("Defendant Officer Pell" or "Officer Pell").

18.     Ortiz lied to Officer Pell when he told Pell that Plaintiff battered him.

19.     Based upon Defendant Ortiz's false representations, Officer Pell falsely arrested Plaintiff on May 20, 2018, for the charge of battery.

20.     When Defendant Ortiz spoke with Officer Pell, Ortiz advised Officer Pell that he was employed in law enforcement and that he was trying to break an active fight in the parking lot of Toyota Park involving Chicago Fire and Houston fans.

21.     Defendant Ortiz told Defendant Officer Pell that he was employed in law enforcement so that Officer Pell would not question the veracity of his claims.

22.      Defendant Ortiz informed Officer Pell that to that Plaintiff struck the back of his head with a closed hand and that Plaintiff forcefully took him to the ground.

3

23. Defendant Ortiz also told Defendant Officer Pell that when he got up from the ground he observed Plaintiff running away.

24. As depicted below, multiple cellphone videos and security camera footage from Toyota Park demonstrate that Plaintiff did not punch or otherwise harm Defendant Ortiz on May 20, 2018.

25. Contrary to an earlier analysis of the facts, Defendants Ortiz and Nesis did not err in identifying Plaintiff as the suspect. Instead, they conspired together and with others to railroad Plaintiff for a crime that he absolutely did not commit.

26. As described below, Defendant Officer Pell did not have probable cause to arrest Plaintiff based upon the word of Defendant Ortiz.

27. On information and belief, the security camera footage existed at the time of Plaintiff's arrested and still exists. Given the proximity of at least five security cameras that were pointed towards the incident between Plaintiff and Defendant Ortiz, the conflicting statements between Defendant Ortiz and Plaintiff, the lack of any visible injuries to Ortiz, and the lack of exigent circumstances, Defendant Officer Pell should have reviewed the security camera footage.

28. Since Officer Pell was called to Toyota Park and appears to have arrived while the Post-Game Incident was still in progress (or shortly after it ended), a reasonable officer in his position should have reviewed the video footage to confirm the identity of the alleged perpetrator. If Officer Pell had examined the security video footage, it may have been possible for him to have identified the alleged perpetrator, assuming for the sake of argument that someone – not Plaintiff had barred Defendant Ortiz.

29. As detailed below, certain security camera footage was not produced in response to a lawful subpoena issued by Plaintiff during his criminal case.

4

30. The Supreme Court has categorically held that it is unlawful for governmental employees to withhold of evidence that is material to the determination of either guilt or punishment of a criminal defendant. *See, Brady v. Maryland,* 373 U.S. 83 (1963). Generally, "a private citizen cannot [ ] be held liable under Section 1983 because that statute requires action under color of state law." *Brokaw v. Mercer County*, 235 F.3d 1000, 1016 (7th Cir. 2000). However, "if a private citizen conspires with a state actor, then the private citizen is subject to Section 1983 liability." *Id.*

31. Defendant Rodriguez is President and CEO of Chicago Fire Soccer, LLC ("Chicago Fire Soccer"), the legal entity that operates the Chicago Fire.

32. When Defendant Rodriguez conducts what he deems to be sensitive business on behalf of the Chicago Fire, he uses a private email address to avoid having his emails be stored on a server maintained by the Chicago Fire.

33. Defendant Rodriquez is no mere private citizen. Rather, based upon Defendant Rodriguez's public statements, he believes and maintains that he has the authority over Village of Bridgeview and Monterrey Security to order employees of Monterrey Security to expel fans from Toyota Park.

34. As a matter of law, a defendant's Hispanic or Latino surname does not insulate him from being sued for heritage or national origin based discrimination.[2]

---

[2] *See, e.g., St. Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S. Ct. 2022, 2027-28 (1987); *Billingsley v. Jefferson County*, 953 F.2d 1351, 1353 (11th Cir.1992); *In re Lewis*, 845 F.2d 624, at 635 (6th Cir.1988); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 n.5 (4th Cir. 2002); *Flores v. Merced Irrigation Dist.*, 758 F. Supp. 2d 986, 999 Fn 9 (E.D. Cal. 2010); *PAS Communs. Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1168-69 (D. Kan. 2001); *Cardona v. American Express Travel Related Services Co.*, 720 F. Supp. 960, 961-62 S.D. Fla. 1989); *Walker v. Secretary of Treasury, IRS*, 713 F. Supp. 403, 407-08 (N.D. Ga. 1989). A plaintiff is required present enough *circumstantial evidence* to allow a rational jury to infer that discriminatory intent motivated the misconduct at issue. *See, e.g., Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 733-34 (7th Cir. 2011). Circumstantial evidence may include suspicious timing; ambiguous statements; behavior or comments directed at others in the protected class; and evidence that similarly situated employees outside the protected class received systematically better treatment. *See, e.g., Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009).

35.    The below a screen capture of a cellphone video from May 20, 2018, depicts Plaintiff (wearing the No. 14 shirt) and Defendant Ortiz (dressed in all black) with his left hand touching Plaintiff's right upper arm:



36.    In the May 20, 2018, cellphone video screen capture depicted above, Defendant Nesis is male to the far right of the above screen image, wearing white shoes.

37.    In the May 20, 2018, cellphone video screen capture depicted above, Defendant CESAR PEREZ ("Defendant Perez"), an employee of Monterrey Security, is the individual standing behind Defendant Ortiz, wearing dark glass and a cap.

38.    At this point in the video, Nesis points at Plaintiff and says, "that guy goes to jail, he goes to jail, put him in custody, put him in the lock-up, he's going to jail."

39.    By instructing Defendants Ortiz and Perez to arrest Plaintiff and cause him to be taken to jail, the Defendant Nesis acted under of color of law.

40.    Defendant Perez responded to Defendant Nesis' words by attempting to

detain Plaintiff, despite there being no basis to arrest or detain Plaintiff because Plaintiff did not batter Defendant Ortiz.

41.     The below screen capture from May 20, 2018, cellphone video depicts Plaintiff backing away from Ortiz (in black) and Perez (in hat and sunglasses):



42.     The below screen capture of a cellphone video from May 20, 2018, depicts Defendant Ortiz standing next to Defendant Perez, and this image depicts Plaintiff's hand on the right side of the image:



43.     As explained below, Ortiz told Officer Pell that Plaintiff struck him with a closed hand on the back of his head and claimed that Plaintiff forcefully took him (Ortiz)

8

to the ground and then ran away.

44.     This alleged conduct did not take place as demonstrated by the cell phone video and security camera footage taken from cameras attached to Toyota Park.

45.     The below screen capture of a cellphone video taken May 20, 2018, depicts Defendant Ortiz, Defendant Perez and Plaintiff moments after the above video image was screen captured:



46.   The below screen capture image was taken from a cellphone video made on May 20, 2018, and was screen captured moments after the above image. The image depicts Defendant Ortiz stopping his pursuit of and (turning to his left) as Defendant Perez follows Plaintiff:



47.     The below screen capture of a cellphone video from May 20, 2018, depicts Defendant Ortiz, moments after the prior image was captured.   The image shows Defendant Ortiz facing to face cellphone camera as Defendant Perez continues to follow Plaintiff.  Plaintiff's leg (in grey) can be seen at the far right of the image:



48.     Defendant MIKE BUBACZ ("Defendant Bubcz" or "Bubcz") is depicted in the top center of this image, to the right of the blue trashcan.

49.     Upon information and belief, Defendant Bubcz is employed by Major League Soccer, LLC ("MLS") on a contract basis as Soccer Security Agent.  In this role, Bubcz was tasked with overseeing security at MLS sponsored soccer matches.

50.     Upon information and belief, Defendant Bubcz is also employed in law enforcement, and this fact is known to all of the Defendants named in this case.

51.     Defendant Bubcz on information and belief, was and is a contract

employee for MLS and was paid on an hourly basis to oversee game day operations and oversee security issues.

52.     On information and belief, the Defendant Bubcz resides in this District.

53.     Defendant Bubcz was at Toyota Park on May 20, 2018.

54.     Defendant Bubcz wore Chicago Fire Soccer credentials on May 20, 2018, which identified him as being "credentialed" (allowed to work game-day operations) by the front office of the Chicago Fire.

55.     Defendant Bubcz took cellphone videos of the Post-Game Incident.

56.     The below image of the Defendant Bubcz has been taken from a cellphone camera video on May 20, 2018, during the Post-Game Incident:



57.     Cellular telephone video shows that Bubcz attempted to detain Plaintiff when Plaintiff was being pursued by Defendant Perez.

58.     Based upon Defendant Bubcz's close proximity to Plaintiff when Plaintiff was confronted by Defendants Ortiz and Nesis, his videos may depict aspects of Plaintiff's interactions with Defendant Ortiz.

59. Until this Court ordered Defendant Rodriquez's counsel to identify Defendant Bubcz, legal counsel for Rodriquez refused to identify Defendant Bubcz, who was previously sued as an "unknown Soccer Security Agent."

60. Defendant Bubcz and other currently unknown individuals created a dossier-like document about the Post-Game Incident. On information and belief, the document include references to Plaintiff's arrest.

61. Despite having knowledge of and/or access to evidence which exonerated Plaintiff and/or draw into question the veracity of Mr. Ortiz's account of his interaction with Plaintiff on May 20, 2018, Defendant Bubcz refused to intervene to cause Defendant Ortiz's false charges against Plaintiff to be dropped.

62. On May 20, 2018, Defendant MARK KRAFT ("Defendant Kraft" or "Kraft"), was employed by the Village of Bridgeview, as the Deputy Director of the Village's Emergency Management Agency.

63. As detailed below, Defendant Kraft unjustifiably tripped Plaintiff, which caused Plaintiff to him to fall onto asphalt and suffer injuries.

64. When Defendant Kraft tripped Plaintiff he was acting under color of law as an employee of the Village of Bridgeview.

65. A cellphone video footage taken on May 20, 2018, shows that Kraft (depicted in light blue jeans and red baseball hat) tripped Plaintiff without justification.

66.    The below image is taken from a screen capture image from the cellphone video, taken moments after Defendant Kraft tripped Plaintiff:



67.    Plaintiff fell to the ground headfirst after he was tripped Defendant Kraft and injured his wrist.

68.    Defendant Kraft is being sued because committed excessive force and the tort of battery on Plaintiff by sticking his foot out and tripping Plaintiff.

69.    The manner in which the Defendant Kraft acted was excessive and dangerous under the circumstances because Plaintiff did not pose a physical threat to Defendant Kraft.

70.    Immediately after Defendant Kraft tripped Plaintiff, Defendant CESAR PEREZ ("Defendant Perez"), an employee of Monterrey Security, detained Plaintiff by jumping onto Plaintiff's back while he was sprawled out on the asphalt.

71.    In attempting to detain Plaintiff, Defendant Perez applied handcuffs to Plaintiff's wrists.

72.    The manner in which Defendant Perez handcuffed Plaintiff exacerbated the injury to Plaintiff's wrist.

73.    Additionally Defendant Perez placed his knees onto Plaintiff's back while

he handcuffed Plaintiff.

74.     Defendant Perez's actions made it difficult for Plaintiff to breathe.

75.     Plaintiff did not attempt to evade Defendant Perez once Plaintiff fell to the ground (after being tripped by Defendant Kraft).

76.     After Perez handcuffed Plaintiff, he lifted Plaintiff up from the asphalt.

77.     Defendant Perez lifted Plaintiff up from the asphalt into a standing position by grabbing Plaintiff's handcuffs.

78.     The manner in which Defendant Perez lifted Plaintiff off the asphalt caused injury to Plaintiff's shoulders.

79.     After handcuffing Plaintiff, Defendant Perez took Plaintiff to the lock-up room located within Toyota Park.

80.     After Defendant Perez placed Plaintiff inside a holding cell within the lock-up area inside of Toyota Park, Defendant TERRY THOMPSON ("Defendant Thompson"), a supervisory employee of Monterrey Security, approached Plaintiff.

81.     On May 20, 2018, Defendant Thompson was also employed in the field of law enforcement.

82.     Defendant Thompson, in his capacity as a supervisory employee for Defendant Monterrey Security, and in his dual role as a law enforcement offer, observed Plaintiff when Plaintiff was in the lock-up inside of Toyota Park on May 20, 2018.

83.     Defendant Thompson noticed that Plaintiff was using his cellular phone inside of the lock-up.

84.     When Defendant Thompson observed that Plaintiff was using his cellular phone inside of the lock-up, he became enraged.

85.     Thereafter, Defendant Thompson opened the cell door and pushed Plaintiff's body and face against a wall.

15

86. Seconds later, Thompson yelled out to Plaintiff; "you must be a dumb motherfucker for punching a cop."

87. Thompson used excessive force when he handcuffed Plaintiff.

88. The amount of force that Defendant Thompson applied immediately caused Plaintiff to feel pain.

89. As a result of Defendant Thompson's conduct, Plaintiff's wrists showed marks from the pressure that was applied to them.

90. In doing so, Defendant Thompson committed the tort of battery.

91. Photographs of Plaintiff's wrists taken on May 20, 2018, show the marks caused by excessive force used by Thompson.

92. Several currently unknown witnesses, including, but not limited to the Defendant Bubcz, were standing close to Defendant Thompson when he pushed Plaintiff and tightened the cuffs, but these individuals failed to intervene to stop Thompson.

93. As noted above, despite knowing that Defendant Ortiz's accusations as to Plaintiff were false, and/or despite questioning the validity of Defendant Ortiz's accusations, Defendant Officer Pell arrested Plaintiff without probable cause.

94. On information and belief, Defendant Officer Pell agreed to take the word of Defendants Ortiz and Nesis based upon their association with law enforcement.

95. Defendants Ortiz and Nesis, by invoking their law enforcement status to encourage Defendant Officer Pell to falsely arrest Plaintiff, acted under color of law.

96. As of the filing of this Civil Action, Defendants Ortiz, Thompson and/or Nesis failed to prevent Plaintiff from being wrongfully prosecuted.

97. During the time that Plaintiff was held in the lock up, he was approached by ALEJANDRO MIRET ("Miret").

98. Miret presented Plaintiff with a false written confession that stated Plaintiff

had battered Defendant Ortiz.

99.  Miret repeatedly told Plaintiff to sign the document.

100.  Miret was instructed by Defendants Ortiz, Thompson and/or Nesis to prepare a false narrative confession in order to cover for the misconduct of Defendants Ortiz, Thompson and Nesis.

101.  By urging Plaintiff to sign a false confession, Miret was acting under color of law and at the direction of Defendants Pell, Ortiz, Thompson and Nesis.

102.  Defendants Pell, Ortiz, Thompson and Nesis, by causing, allowing and/or instructing Miret to draft a false confession and urge Plaintiff to sign it, were acting under color of law and abused their roles as law enforcement officials.

103.  Miret did not force a confession upon similar situated non-Hispanic males who allegedly committed crimes on May 20, 2018, and in particular, did no urge D.W., a causation male, to sign a confession.

104.  Plaintiff refused to sign the false confession because the document falsely stated that Plaintiff had battered Defendant Ortiz.

105.  Defendants Officer Pell, Ortiz, Thompson Nesis, and Miret treated Plaintiff *worse* than Badr Tabbaq, a Houston Dynamo fan who was detained at Toyota Park on May 20, 2018, by Defendant Perez.

17

106.    Tabbaq is depicted in the below screen capture of a cellphone video wearing a black knit where the video shows him being detained by Defendant Perez (in a knit hat and sunglasses):



107.    Defendant Nesis is the man holding the cigar.

108.    According to the statement that Defendant Nesis gave to Officer Pell, Badr Tabbaq was an *instigator* in a the Post-Game Incident.

109.    Mr. Tabbaq got into a physical altercation with one or more Monterrey Security employees.

110.    Tabbaq was detained by Defendant Perez.

111.    Despite exhibiting worse behavior than Plaintiff, Tabbaq was not arrested or prosecuted as a result of his conduct.

112.    Additionally, cellular phone videos demonstrate that several persons in the parking lot made physical contact with employees of Monterrey Security and despite these persons being physically seized by employees of Monterrey Security; the employees in question released the persons, and did so without pressing charges.

113.    On May 20, 2018, Mario Gonzalez was employed as Chicago Fire's Manager of Outside Ticket Sales.

18

114.    As Chicago Fire's Manager of Outside Ticket Sales, one of his roles involved acting as a liaison for visiting fans.

115.    Gonzalez served in this capacity on May 20, 2018.

116.    Gonzalez took cellphone videos of the Post-Game Incident, and in doing to do, he may recorded Plaintiff's interactions with Defendants Ortiz and Nesis.

117.    The image on the following page was taken from cellphone camera video footage on May 20, 2018, and it depicts Gonzalez, a Chicago Fire employee, is on the right-hand side of this image, holding a cellular telephone in his right hand and Defendant Bubcz on the left-hand side of the image, holding a cellular phone in his right hand:



118.    By and through his legal counsel, Mr. Gonzalez refused to provide his cellphone videos to Plaintiff's attorney during Plaintiff's criminal prosecution.

119.    The final seconds of the cellular phone video of Plaintiff's interaction with Defendant Ortiz (as depicted in the screen captures identified in Paragraphs 33, 36-38) demonstrates that Mario Gonzalez *was only a few feet away from Plaintiff and Ortiz* during their interaction.

120.    Gonzalez's proximity to Plaintiff and Ortiz during their interaction led to the following email exchange – which did not result in the production of any of Mr. Gonzalez's cellular phone videos.

121.    On July 12, 2018, at 9:54 a.m., counsel for Plaintiff emailed to outside counsel for Chicago Fire Soccer relative to a subpoena issue relative to the pending criminal case and wrote the following:

> I'm writing to you to avoid any drama or litigation on my end. I do not feel like you've been given honesty answers to give to me. Simply stated, someone is giving you incomplete information or they have told you to give me incomplete or misleading information.
>
> 1. Mr. Gonzalez's role is far greater than you told me. He has a role as liaison for traveling supporters.
>
> 2. He is video taping during the incident. Not just at the end as you indicated.
>
> 3. He was communicating with FO at the time of the incident.
>
> 4. The FO knows who the MLS jacketed employee is.
>
> 5. I have confirmation that the MLS employee was in the lock up.
>
> 6. And the FO has a dossier of sorts from MLS on this incident.
>
> 7. Finally, the FO has been given access to Toyota Park videos which show SL members traversing the stadium. Including my client. This evidence supports my time line.
>
> While it is possible that I have been misinformed by the individuals who have spoken to me, I doubt that to be the case. They have no reason to get stir up trouble.  Rather I believe that they are just honest people who are fed up with deception or misinformation.
>
> I would like to set up a call today if possible. Otherwise I think I will have to escalate things as to the criminal case and civilly. Let me know what's best for you and your client.
>
> Thanks.

122.    Outside counsel for Chicago Fire Soccer responded on July 12, 2018, at 10:04 a.m. and wrote the following:

> James: you seem to be under a misperception that this is a civil case where we sit and answer whatever question comes to your mind. You have asked us for Fire videos regarding Mr. Calderon in connection with your role in defending him in a criminal matter. I have inquired and informed you of the video that a Fire employee took based on pictures you identified. I am advised that the video has nothing to do with your client and relates to largely post-incident activity.  As I mentioned, I am neither

authorized nor willing to get into the larger issues surrounding the incident. And, you are free to attempt to obtain videos from other sources. I represent the Fire not the Village or the MLS. I am not here to help you identify every non-Fire person you want to learn about. To be blunt, that is your job.

This being said, I am available to speak at 10:30. You can call my office at 312.368.8904.

123.    Despite having video-taped the Post-Game Incident and potentially aspects of Plaintiff's interactions with Defendants Ortiz and Nesis, Mr. Gonzalez has failed to provide this cellphone video to the Cook County State's Attorney's Office.

124.    As detailed below, static and movable digital video cameras are located in and around Toyota Park.

125.    There are at least five security video cameras affixed to Toyota Park that face the below depicted "East Lot General Parking."



126. The above image can be found at https://www.chicago-fire.com/matchday/parking-and-directions

127. Two security video cameras are stationed by the "D" depicted on the above image while a single video camera is stationed by "D1". The fourth camera is stationed just north of "D". The fifth camera is mounted to on the northest cornfer of the roof of Toyota Park which is depicted above as a white rectangle.

128. The incident with Plaintiff and Defendants Ortiz, took place within the confines of the "VIP LOT."

129. Defendant Kraft tripped Plaintiff at the western edge of the VIP LOT.

130. These security video cameras would have been facing the location of where Defendants Ortiz and Nesis encountered Plaintiff.

131. The security video cameras facing the East Lot General Parking would have been facing the location of where Plaintiff was tripped by the Defendant Kraft.

132. Additionally, the security video cameras facing the East Lot General Parking would have been facing the location of where Plaintiff was detained and subjected to excessive force by Defendant Perez.

133. There are conflicting reports regarding whether security camera video footage has been preserved and whether security cameras were fully functional.

134. On one hand, in-house legal counsel for Spectra, the entity that manages the day-to-day operation of Toyota Park on behalf of the Village of Bridgeview, has represented that certain video footage taken from video cameras operating at Toyota Park on May 20, 2018, was *not* preserved.

135. According to counsel for Spectra, pursuant to operating procedures, at least one security video was overwritten and the May 20, 2018, video footage as deleted, sometime after the date the footage was recorded.

136.    Outside legal counsel for the Village of Bridgeview has also represented that certain security video footage taken from video cameras operating at Toyota Park on May 20, 2018, was *not* preserved.

137.    According to outside legal counsel for the Village of Bridgeview, the only security video that was preserved is from the fifth from a security camera on the northeast side of the Toyota Park.

138.    The security video footage preserved from this camera angle depicts Plaintiff walking through East Lot General Parking in a southbound direction.

139.    This security video footage depicts Plaintiff walking around a particular vehicle and matches up with *handheld cellular phone video* – taken at the same time - that shows Plaintiff walking next to the same vehicle depicted in the security video footage taken from the camera on the northeast side of Toyota Park.

140.    Shortly thereafter, security video from the video camera on the northeast side of Toyota Park depicts Plaintiff being detained on the asphalt as described above.

141.    On information and belief, there is other security camera video footage from May 20, 2018, that currently exists, but was not been tendered to Plaintiff and the prosecutor during the pendency of Plaintiff's criminal case.

142.    On information and belief, MLS and Defendant Rodriquez have obtained copies of the security videos that still exist but were not tendered to Plaintiff and the prosecutor during the pendency of Plaintiff's criminal case.

143.    On information and belief, Defendant Rodriguez was present at Toyota Park on May 20, 2018, and witnessed and/or learned of Plaintiff's arrest on that day.

144.    Defendant Rodriguez was also informed in writing that Plaintiff was falsely arrested on or about May 30, 2018, and no later than June 22, 2018.

145.    On May 30, 2018, John Urban, Chicago Fire Soccer Club's Chief Operating

23

Officer, was presented with two cellphone videos that depicted Plaintiff's interaction with Defendant Ortiz on May 20, 2018.

146.   This video footage demonstrates that Plaintiff did not batter Ortiz.

147.   Mr. Urban forwarded the two videos to Defendant Rodriguez, or at the very least informed Rodriguez of what is depicted in the videos – that Plaintiff did not batter Ortiz or come into contact with Ortiz.

148.   On information and belief, Defendant Rodriguez knew or should have known that Defendant Urban had received two cellular phone videos depicting Plaintiff's interaction with Defendant Ortiz on May 20, 2018.

149.   On June 22, 2018, Defendant Rodriguez was informed via email that Plaintiff was falsely arrested on May 20, 2018.  In full, the email alerted Rodriguez of the following:

> Good afternoon Mr. Rodriguez:
>
> I represent Abraham Calderon in his criminal proceeding as a result of his arrest on May 20, 2018.  Mr. Calderon was arrested in a case of mistaken identify.  Video evidence shows that he was detained minutes before scuffles broke out between Fire fans and Houston fans – where unfortunately, the evidence identifies fans of both clubs scuffling with security staff. One individual appears to get knocked to the ground. Mr. Calderon was not present at this time. When Mr. Calderon was detained, he was taken to the ground violently and physically and verbally abused by security staff.  The resolution of his mistreatment will have to wait for another day and possibly another court proceeding – but simply stated – this is not the first time security staff has acted in this manner.
>
> Here is the point of my email - next week I intend to have the attached subpoena to be personally served on you and your employees that are listed on the subpoena.  But as a professional courtesy to you and your employees, I am emailing you to see if you are willing to accept service of the attached subpoena.  To be clear, I am reaching out to you avoid the inconvenience of you having to be personally served, and especially your front-line staff.
>
> I presume that you may refer this to Club's outside counsel or MLS legal.  **Until you link me up with your outside counsel (or MLS legal), I want to explain the scope of the subpoena in order to ensure that you and your staff preserve all documents and evidence.**
>
> The subpoena  seeks documentation created in the weeks and days leading up to the May 20, 2018, event - such as documents evidencing efforts to preserve the peace

between Sector Latino and Houston fans. We also expect the Club and your employees to produce all documents, texts, emails and still and video images made or taken on May 20, 2018, as well as any documents, texts, voicemails, emails and still and video images that have been created after May 20, 2018. Most likely I will subpoena phone records of the Club and staff for the month of May to determine if anyone went "off line" so-to-speak to avoid future FOIA requests relative to communications with the Village.

Please note that I am possession of still and video images that identify certain Club employees who were in the midst of or close to the altercation(s) at the end of the game. Some of them were using their phones and/or cameras to record the incident(s). I can work with you or your lawyer to identify the employees or agents in question.

As noted above, I presume a lawyer will get involved on your end. **But in the meantime, please contact me as soon as possible to let me know if you will formally accept service of this subpoena on Monday (on your behalf and on behalf of your staff) to avoid having to use a process server to come to or stake out Toyota Park to serve you – and your employees**. If you prefer to not email me back, just have your lawyer contact me to indicate whether he/she will accept service on your behalf and on behalf of your clients.

If you want to call me, I can be reached after 3 pm today on my cellular phone – which I will send to you if you email me and ask for it.

-James

150.    At the time the email was sent to Defendant Rodriguez, Plaintiff had not uncovered evidence that demonstrated that Defendants Ortiz and Nesis purposefully caused Plaintiff to be falsely arrested and prosecuted. The situation was no longer a case of mistaken identity.

151.    On information and belief, by June 22, 2018, or shortly thereafter, Rodriguez had reviewed cellular phone videos and security camera videos taken on May 20, 2018, in an effort to investigate the participants in the Post Game Incident.

152.    Additionally, security camera videos facing towards the east parking lot at Toyota Park would have demonstrated to Defendant Rodriguez that Plaintiff did not batter Defendant Ortiz. Accordingly, even if Defendant Rodriguez did not observe Plaintiff's interaction with Defendant Ortiz on May 20, 2018, Security camera videos would have provided him with a first-hand account of the incident.

25

153.    By May 25, 2018, employees of the Chicago Fire had reviewed videos taken on May 20, 2018, and the videos did not demonstrate that Plaintiff had battered Defendant Ortiz.  By May 25, 2018, employees of the Chicago Fire had not obtained access to the videos.  On information and belief, the videos discussed above were obtained from the cellular telephone of at least one Chicago Fire employee and a contract employee.  Alternatively, on information and belief, the videos were obtained from a handheld video camera operated by an employee of the Chicago Fire.

154.    On information and belief, Defendant Rodriguez was aware of the existence of the videos outlined in the above Paragraph.

155.    Despite having access to cellular video or  security camera video footage taken from cameras located at Toyota Park, Defendant Rodriguez did not provide any of cellular videos or  security camera video footage to the Cook County State's Attorney's Office.

156.    Defendant Rodriguez was kept aware of the status of Plaintiff's prosecution by a Chicago Fire employee, with the initials N.T., who attended certain court proceedings.

157.    Despite knowing that Plaintiff did not batter Defendant Ortiz, Defendant Rodriguez not contact the Cook County State's Attorney's Office to inform the assigned Assistant State's Attorney that Plaintiff was being wrongfully prosecuted because Rodriguez wanted Plaintiff to be convicted to help further his plan to rid Toyota Park of a group of fans who have joined together to support the Chicago Fire by and through "Sector Latino."

158.    As discussed below,

159.    Defendant Rodriquez is no mere private citizen as he claims to have the ability to control and influence Monterrey Security as evidenced by him giving a pre-

game speech to Chicago fans where he stated that if fans were observed uttering an "inappropriate and offensive chant", they would be "subject to removal."

160.    Rodriquez also advised fans observing the chant to "advise stadium security so we can handle them as well."  See, Chicago Tribune video story hosted at https://www.chicagotribune.com/news/columnists/kass/ct-chicago-fire-anti-gay-soccer-chant-kass-0804-20160803-column.html

161.    Alternatively, on information and belief, Urban wrote to Rodriguez and informed Rodriguez of what was depicted in the videos – that Plaintiff did not batter Ortiz or come into contact as Ortiz explained to Defendant Officer Pell.

162.    Alternatively, on information and belief, Urban spoke to Rodriguez and informed Rodriguez of what was depicted in the videos – that Plaintiff did not batter Ortiz or come into contact as Ortiz explained to Defendant Officer Pell.

163.    Defendant Rodriguez helped cause Plaintiff's civil rights to be violated because in his capacity as the President and CEO of Chicago Fire Soccer, he refused to intervene to cause Defendant Ortiz's false charges to be dropped against Plaintiff and because he refused to intervene to prevent the other named Defendants from conspiring to violate Plaintiff's civil rights.

164.    Defendant Rodriguez claims to respect "honor", but he stubbornly refused to intervene to cause Defendant Ortiz's false charges to be dropped against Plaintiff after he was presented (through his outside legal counsel) with screen captures of cellular videos *and* the opportunity to examine actual cellular videos that demonstrate that Plaintiff did not batter Defendant Ortiz.

165.    Defendant Rodriguez caused, condoned or otherwise allowed Plaintiff's season tickets to be rescinded based upon Defendant Ortiz's false allegations.

166.    Defendant Rodriguez caused, condoned or otherwise allowed Plaintiff to be

banned from Toyota Park for one year based upon Defendant Ortiz's false allegations.

167.   In particular, Plaintiff received a letter from an employee of Chicago Fire Soccer that informed Plaintiff that his season tickets had been cancelled and that he was being banned from Toyota Park for 12 months and under penalty of arrest if he returned to Toyota Park during said 12 month period.

168.   Defendant Rodriguez approved the transmission of the letter and the contents of this letter based upon Defendant Ortiz's false allegations.

169.   Defendant Rodriguez's conduct also Plaintiff to receive a twelve-month ban from all Major League Stadiums throughout the United States and Canada.

170.   Rodriguez knew Defendant Ortiz's allegations were false shortly after learning that cellphone video footage of Plaintiff's interaction with Ortiz existed.

171.   Despite learning that Defendant Ortiz's allegations were false, and/or that cellphone video of Plaintiff's interaction with Defendant Ortiz existed, Defendant Rodriguez did not attempt to rescind the ban or otherwise intervene to protect Plaintiff's federal civil rights or rights under state law.

172.   By failing to provide security camera video footage to the Cook County State's Attorney's Office in response to a subpoena request, Defendant Rodriguez participated in and joined in the conspiracy to wrongfully convict Plaintiff that was hatched by Defendants Ortiz and Nesis, and implemented by Officer Pell, and furthered by Ortiz and Nesis' legal counsel.

173.   Defendant Rodriguez caused and/or allowed Plaintiff to be prosecuted to teach Plaintiff and others like him a lesson and to help Rodriguez orchestrate the ouster of Section Latino from the confines of Toyota Park.

174.   Members of Sector Latino support the Chicago Fire during and away match by exuberantly dancing, chanting and playing drums and horns. Sector Latino's

passionate manner of support is generally referred to as a "barra brava" style of support, which is a somewhat aggressive, machismo derived manner of support.

175. "Barra brava" style support includes standing throughout the match, singing, and other enthusiastic behavior such as waving flags. *See, e.g.,* https://www.bbc.com/news/av/magazine-27668750/la-barra-brava-why-us-football-fans-chant-in-spanish

176. Barra brava style support originated in Argentina and spread throughout the Americas. For example, certain groups of fans in Argentina stood out from other supporters based upon for their ferverant and boisterous support for their teams. These groups were often labeled *Barras,* a term that is equivalent to the term "gang" in certain South American countries.

177. Plaintiff was a member of Sector Latino.

178. Defendant Rodriguez was aware of the fact that Plaintiff was a member of Sector Latino.

179. Even since Defendant Rodriguez joined the Chicago Fire Soccer Club, he had rallied to rid Toyota Park of a particularly offensive chant, "puto!" or "eehhhhhh, puto!", that was sometimes uttered when an opposing goal keeper ran up to initiate a goal kick. See, e.g., https://patch.com/illinois/chicago/homophobic-soccer-chant-shut-down-chicago-fire-gm & https://www.si.com/planet-futbol/2017/07/05/gold-cup-mexico-anti-gay-puto-fan-chant-concacaf-plan

180. For example, in July of 2016, Defendant Rodriguez gave much publicized a pre-game speech to Chicago fans where he stated that if fans were observed uttering an "inappropriate and offensive [homophobic] chant", they would be "subject to removal." Rodriquez also advised fans observing the chant to "advise stadium security

so we can handle them as well."[3] A video of Rodriguez's speech can be found at https://twitter.com/ChicagoFire/status/759887792184918016. See also, Chicago Tribune video story https://www.chicagotribune.com/news/columnists/kass/ct-chicago-fire-anti-gay-soccer-chant-kass-0804-20160803-column.html

181.    The "debate" referenced in footnote 3 has resulted in certain members of Sector Latino engaging in the chant during Chicago Fire soccer matches leading up to Defendant Rodriguez's speech in July of 2016.   Defendant Rodriguez harbored resentment towards Sector Latino based upon the utterance of this chant by certain of Sector Latino's members.

182.    Over the past few years, both privately and publically, Defendant Rodriguez has attempted to curtail the rowdy nature of Sector Latino and has expressed his displeasure over certain alleged acts of misconduct allegedly committed by members of Sector Latino.

183.    The Post-Game Incident led to Defendant Rodriguez to ban certain Chicago Fire Fans who were affiliated with a fan/supporter group known as Sector Latino. Rodriguez also disbanded Section Latino.

184.    Defendant Rodriguez took this action based upon his belief and knowledge that Hispanic members of Sector Latino were involved in the Post-Game Incident - and that these individuals were unwilling to accept responsibility for their conduct.

185.    According to Defendant Rodriguez:

---

[3] There is somewhat of debate as to whether the term is homophobic. See, e.g., https://www.advocate.com/sports/2016/8/04/how-chicago-dealt-soccer-fans-homophobic-chant & https://www.si.com/planet-futbol/2017/07/05/gold-cup-mexico-anti-gay-puto-fan-chant-concacaf-plan.   To be clear, the undersigned agrees that the terms is offensive and homophobic and publically applauded the Chicago Fire's efforts to eradicate the use of the phrase at soccer matches.

"[Sector Latino] and its leadership to the time I've been here has never voluntarily submitted those who were guilty of breaking the fan code of conduct[.]"

"In one particular incident, the number of participants in the incident was large. It was more than a few people, many of whom were trying to obscure their faces, many of whom were wearing a sweatshirt identifying them as members of Sector Latino. The leadership was given every opportunity to bring forth those who violated the code of conduct. They did not. That's what led to the final warning. That's what led to: if you can't control your membership, if you can't modify your behavior, if you can't identify those few bad apples who are ruining it for all of you, you will leave us with no choice.

"And on the very next opportunity, there's a violation of the code of conduct, there is no submission of the guilty party and everything was clear. So we made good-faith efforts, but in the end what I've said and will continue to say, we cannot allow a group to hide or allow to be hidden within them, those that endanger the safety of others."

"From our perspective, we gave multiple opportunities for the leadership to step up and they didn't. The last thing I'll say is we have reason to believe that members of the leadership engaged in violating the fan code of conduct."[4]

186.    Plaintiff became an unfortunate example to other fans – despite have been detained *prior* to the Post-Game Incident fully unfolding.

187.    Simply stated, Plaintiff was used by Defendants Rodriguez, Ortiz, Nesis, Thompson and other currently unknown persons to strike fear into the hearts of Hispanic Chicago Fire fans who associated themselves with Sector Latino.

188.    Because Defendant Rodriguez and other currently unknown persons were fed up with the perceived unruly behavior of certain known and unidentified Hispanic members of Sector Latino, and because Defendants Ortiz, Thompson and Nesis harbored a strong dislike and personal animus towards Plaintiff, Plaintiff was detained, arrested and prosecuted for a crime he did not commit.

189.    As detailed below, because Plaintiff is of Hispanic origin, and in particular

---

[4]    See,    https://www.prosoccerusa.com/mls/chicago-fire/general-manager-nelson-rodriguez-answers-questions-about-sector-latino-ban/

of Mexican ancestry, he was treated him worse than similarly situated non-Hispanic fans who interacted with Monterrey Security during the on May 20, 2018, Post-Game Incident, and with at least one other Caucasian fan who allegedly assaulted no less than two minors during the 2018 season.

190.    In particular, Defendants Ortiz, Nesis and Rodriguez purposefully declined to cause a Caucasian fan to be arrested for allegedly assaulting and/or battering minors during Chicago Fire matches.

191.    As set forth above, Defendants Ortiz, Nesis, Rodriguez and other currently unknown Defendants utilized and invoked the Village of Bridgeview's police powers to unlawfully ban Plaintiff from attending Chicago Fire Soccer matches, a ban that was only lifted after the Cook County State's Attorney's Office caused Defendant Ortiz's false batter charge to be dropped.

192.    JACK E. BENTLEY ("Bentley") is outside counsel for Monterrey Security. In June of 2018, Mr. Bentley received and/or was privy to evidence that exonerates Plaintiff.

193.    During the first court appearance relative to Defendant Ortiz's battery charge, Bentley represented Ortiz. Prior to the Court hearing, defense counsel for Plaintiff showed Bentley a cell phone video which demonstrated that Mr. Ortiz's account of his interaction with Plaintiff on May 20, 2018, was demonstrably false because the video showed that Plaintiff did not batter Ortiz as Ortiz had alleged.

194.    After Bentley was shown the cellphone video of Ortiz's interaction with Plaintiff and the video of Plaintiff being tripped by Defendant Kraft, Bentley indicated that he would like to resolve the criminal charges in Plaintiff's favor, but that "it is not my call to make."

195.    Before and after future court appearances, criminal defense counsel for

32

Plaintiff would ask Bentley whether his superiors and Mr. Ortiz were going to ask the prosecutor to drop the false charge against Plaintiff. Bentley responded by indicating that Mr. Ortiz intended to proceed forward despite what was shows on the cell phone video.

196. Defendant GENEVIEVE MARIE LEFEVOUR ("Defendant LeFevour") is outside counsel for Monterrey Security and resides in this District.

197. In or around June of 2018, Defendant LeFevour learned of evidence that exonerated Plaintiff and draw into question the veracity of Defendant Ortiz's account of his interaction with Plaintiff on May 20, 2018.

198. Thereafter, on more than one occasion, criminal defense counsel for Plaintiff emailed Defendant LeFevour and explained what is depicted in the aforementioned cellular phone videos, and in particular that the videos showed that Plaintiff did not batter Defendant Ortiz

199. Criminal defense counsel for Plaintiff asked LeFevour to ensure that Ortiz would seek to drop his meritless charge and discontinue his malicious prosecution of Plaintiff.

200. By and through her associate attorney (Bentley), Defendant LeFevour was aware of video evidence that exonerates Plaintiff and demonstrates that Mr. Ortiz's account of his interaction with Plaintiff on May 20, 2018, was demonstrably false.

201. Despite having gained this knowledge, Defendant LeFevour represented Defendant Ortiz in his role as a complaining victim relative to the charge of battery that was brought on behalf of Ortiz and against Plaintiff.

202. Despite knowing that Mr. Ortiz's account of his interaction with Plaintiff on May 20, 2018, was demonstrably false, Defendant LeFevour refused to intervene to cause Defendant Ortiz's false charges to be dropped.

33

203.   As a lawyer, Defendant LeFevour had a professional obligation to prevent her client from knowingly submitting perjured testimony.

204.   Instead, when Defendant Ortiz's credibility was attacked in open court during a particular court appearance, Defendant LeFevour was instrumental in representing to the prosecutor that Defendant Nesis was an eyewitness to the alleged battery, and did so despite knowing that Defendant Nesis was lying.

205.   At no time did LeFevour inform the prosecutor that she had doubts as to the veracity of Ortiz and Nesis's accounts of Ortiz's interaction with Plaintiff on May 20, 2018.

206.   Despite Defendant LeFevour's knowledge of and access to exonerating video evidence, she helped continue Defendant Ortiz's false criminal charge against Plaintiff.

207.   Despite having knowledge of and/or access to evidence that exonerates Plaintiff and/or draw into question the veracity of Defendant Ortiz's account of his interaction with Plaintiff on May 20, 2018, Defendant LeFevour refused to intervene to cause Defendant Ortiz's false charges to be dropped, and instead, helped ensure that the charges would continue – by and through the naming of Defendants Nesis as a witness (despite knowing that Nesis was lying).

208.   Despite having knowledge which demonstrated that Defendant Ortiz would be committing perjury if he testified to his false account of his interaction with Plaintiff on May 20, 2018, Defendant LeFevour refused to intervene to cause Defendant Ortiz's false charges to be dropped.

209.   Despite having knowledge which demonstrated that Defendant Ortiz would be committing perjury if he testified to his false account of his interaction with Plaintiff on May 20, 2018, Defendant LeFevour was present in court on the morning of

Plaintiff's trial date along with Defendants Ortiz and Nesis.

210.    By escorting Defendants Ortiz and Nesis to court, and interacting with the assigned Assistant State's Attorney before court, Defendant LeFevour intended to influence the assigned Assistant State's Attorney to counteract and bolster the lies that she knew Defendants Ortiz and Nesis were going to make in open court.  In this capacity, Defendant LeFevour intended to be an active part in the continued prosecution of Plaintiff.

211.    Simply stated, Defendant LeFevour, in her capacity as Defendant Monterrey's outside counsel, appeared in court and interacted with the assigned Assistant State's Attorney to ensure that Plaintiff would be wrongfully convicted to help diminish any civil suit that Plaintiff would file against Defendants Monterrey, Ortiz, Nesis and Perez.

212.    On December 19, 2018, the prosecution resolved the charge of battery in favor of Plaintiff by dismissing the charge on the record as being "nolle prossed."

213.    Defendant LeFevour, despite being a private citizen, participated in joint action with Defendants Officer Pell, Ortiz, Thompson, and Nesis by agreeing to conspire together to cause Plaintiff to continue to be prosecuted for a crime that he did not commit.

214.    The Defendants in the preceding paragraph entered into a joint course of action which involved them ignoring mounting evidence which demonstrated that Plaintiff was innocent of the charges against him – and in particular – that Plaintiff did not come into the type of physical contact that Defendant Ortiz had alleged to have taken place.

215.    The continued prosecution of Plaintiff in the face of exonerating video evidence would not have occurred in the absence of a meeting of the minds to conspire

to continue the unsupported prosecution of Plaintiff.

**Count I**

**4th Amendment False Arrest Claim vs. Defendants Ortiz, Nesis and Officer Pell**

216.     Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

217.     This claim is brought pursuant to the Fourteenth Amendment by and through 42 U.S.C. Section 1983.

218.     During the "meet the team" event, Plaintiff complained to Chicago Fire Soccer staff and Monterrey Security staff regarding the mismanagement of a "meet the team" event, and in particular, Plaintiff complained about other fans cutting long lines that had formed in front of certain soccer players.

219.     Defendant Thompson interacted with Plaintiff during the meet the team event.  On information and belief, Defendants Ortiz and/or Nesis were also present at the meet the team event, and interacted with Plaintiff.

220.     As a result of his verbal complaints to staff, Plaintiff was taken away from the event (which was being hosted inside Toyota Park, around the soccer field) and taken to a room.

221.     Plaintiff was forcibly placed into a chair by a currently unknown Monterrey Security employee.

222.     The same or another currently unknown Monterrey Security employee placed his hand forcible on and around Plaintiff's throat.  All of this took place in the presence of Defendant Thompson.

223.     During this encounter, Defendant Thompson verbally harassed Plaintiff.

36

224.    Despite knowing that Plaintiff did not batter Defendant Ortiz on May 20, 2018, on May 20, 2018, Defendant Nesis conspired with Defendant Ortiz to cause Plaintiff to be falsely arrested by Defendant Officer Pell.

225.    In particular, Defendant Nesis informed Defendant Officer Pell that he was a police officer in order to urge, cause and/or encourage Defendant Officer Pell to agree to falsely charge Plaintiff with battering Defendant Ortiz.

226.    On information and belief, Defendant Officer Pell agreed to go along with Defendant Ortiz and Defendant Nesis's false narrative relative to what happened when Plaintiff encountered Defendants Ortiz and Nesis on May 20, 2018.

227.    Further, Defendants Nesis and Thompson did not intervene to prevent Plaintiff from being wrongfully arrested on May 20, 2018.

228.    In fact, Defendants Nesis and/or Thompson referred to Plaintiff as a troublemaker in the presence of Officer Pell (referring to the meet the team incident).

229.    Further, Defendant Thompson castigated Plaintiff while he was in the lock up with Defendant Officer Pell, saying "you must be a dumb motherfucker for punching a cop."

230.    Similarly, Defendant Officer Pell, by agreeing to go along with Defendant Ortiz and Defendant Nesis's false narrative relative to what happened when Plaintiff encountered Defendants Ortiz and Nesis on May 20, 2018, caused Plaintiff to be wrongfully arrested on May 20, 2018.

231.    Defendant Officer Pell should have questioned the veracity of Defendant Ortiz's accusation for several reasons.  First, Defendant Ortiz advised Officer Pell that he was trying to break an active fight in the parking lot of Toyota Park.  Accordingly, even if Ortiz was telling the truth about being struck in the back of his head by some person, Officer Pell should have questioned the reliability of Ortiz's identification of

Plaintiff because it would not have been plausible or reasonable for Ortiz to have seen his alleged attacker under the specific set of circumstances that he described to Officer Pell.

232.    Second, Defendant Ortiz advised Officer Pell that he was struck in the back of the head with that he was struck with a closed hand, as opposed to an open hand. Because Ortiz reported to Officer Pell that he was struck in the back of the head, Officer Pell should have questioned the plausibility or reasonableness of Ortiz's claim that he was struck with a closed hand – and in particular, that Plaintiff was in fact his assailant.

233.    Third, Defendant Ortiz advised Officer Pell that he was taken down to the ground by Plaintiff.  Officer Pell should have questioned Ortiz's identification of Plaintiff because it is not reasonable for Defendant Ortiz to have assumed that Plaintiff was his attacker under the circumstances.

234.    Fourth, Defendant Ortiz advised Officer Pell that Plaintiff was his attacked after Ortiz allegedly observing Plaintiff running away. Officer Pell should have questioned Ortiz's identification of Plaintiff because it is not reasonable for Defendant Ortiz to have assumed that Plaintiff was his attacker under the circumstances.  In particular, as noted above, Defendant Ortiz reported to Officer Pell that a fight was in progress at the time he interacted with Plaintiff.  Security camera footage would have eliminated Plaintiff as a suspect.

235.    Fifth, Defendant Officer Pell had a reasonable basis to question the veracity of Defendant Ortiz's report of battery because Officer Pell reported that he observed no visible injuries and that Ortiz refused medical care – despite Ortiz claiming that he was struck with a close hand on the back of his head, and that he was forcefully taken to the ground.

236.    Sixth, Defendant Officer Pell had a reasonable basis to question the

veracity of Defendant Ortiz's report of battery because when Officer Pell interviewed Plaintiff, Plaintiff's statement appeared earnest and more credible than what Defendant Ortiz reported to Officer Pell. According to Officer Pell's Report, Plaintiff denied striking Defendant Ortiz, but *admitted* to flicking a cigarette at Houston fans and running away from security personnel. Plaintiff's version of the events (as reported by Officer Pell) was more credible than Defendant Ortiz's version of what Ortiz *thought he saw*, because according to Officer Pell's narrative report, Plaintiff admitted to flicking a cigarette at Houston fans and running away. While neither of Plaintiff's purported admissions warranted criminal charges, by admitting the conduct as it was written in Officer Pell's report, Plaintiff *should have gained credibility* in Pell's eyes.

237. Because of the conflicting versions of events, the lack of any exigent circumstances, the fact that there was no pressing security threat posed by Plaintiff (Plaintiff was detained within the confines Toyota Park), Defendant Officer Pell should have examined the exterior security camera footage that was maintained inside of Toyota Park. As a Village of Bridgeview Police Officer, and based upon his prior encounters at Toyota Park, Defendant Pell was aware of the existence of external security cameras at Toyota Park.

238. As alleged above, during Defendant Ortiz's interaction with Defendant Officer Pell, Ortiz reminded Pell that he was employed the field of law enforcement. Alternatively, Pell knew that Ortiz was employed the field of law enforcement.

239. If Defendant Ortiz informed Defendant Officer Pell of his status as a law enforcement officer, Ortiz did so for the purpose of influencing Officer Pell's decision-making process to cause Pell accept Ortiz's version of the events as opposed to Plaintiff's.

240. On May 20, 2018, Defendant Ortiz and Defendant Officer Pell and agreed and conspired to cause Plaintiff to be arrested despite the fact that Plaintiff did not

batter Ortiz.

241.   As detailed below, based upon their prior interaction with Plaintiff, Defendants Ortiz and Nesis maliciously prosecuted by continuing to urge prosecutors to continue to charge and convict Plaintiff of the charge of battery, all out of an immense personal dislike of Plaintiff.

242.   In particular, for no justifiable reason(s), Defendants Ortiz and Nesis harbor a personal animus towards Plaintiff that caused Defendants Ortiz and Nesis to falsely charge Plaintiff with the crime of battery.

243.   For these reasons, Defendants Ortiz and Nesis failed to cause the false battery charge to be dropped and caused Plaintiff to be wrongfully prosecuted.

244.   Defendants Ortiz, Nesis and Defendant Officer, Pell acted under color of law on May 20, 2018.

245.   As a result of the actions of Defendants Ortiz, Nesis and Defendant Officer, Pell, Plaintiff has suffered damages in the form of the denial of his rights under the law including, but not limited to, the denial of his liberty, reputational harm, emotional distress and the costs of retaining counsel to defend him in criminal court.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendants Ortiz, Nesis and Officer Pell, and he is entitled to compensation for his deprivations including, but not limited to, punitive damages and attorney's fees.

### Count II - State Law False Arrest Claim vs. Defendants Ortiz, Nesis and Pell

246.   Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

247.   This claim is brought pursuant to Illinois law based upon the unlawful actions of Defendants Ortiz, Nesis and Defendant Officer, Pell which caused or lead to Plaintiff being falsely arrested.

248.    As a result of the actions of Defendants Ortiz, Nesis and Defendant Officer, Pell, Plaintiff has suffered damages in the form of the denial of his rights under the law including, but not limited to, the denial of his liberty, reputational harm, emotional distress and the costs of retaining counsel to defend him in criminal court.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendants Ortiz, Nesis and Officer Pell, and he is entitled to compensation for his deprivations including, but not limited to, punitive damages and attorney's fees.

### Count III - Violations of § 1981 vs. Defendants Ortiz, Nesis and Rodriguez

249.    Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

250.    Section 1981(a) states that:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

251.    Section 1981(b) defines the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

252.    Section 1981(c) states that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of state law."

253.    To establish a claim under § 1981, a plaintiff must demonstrate: (a) that he/she is a member of a racial minority; (b) that the defendant(s) had an intent to

discriminate on the basis of race; and (c) that the discrimination concerned one or more of the activities enumerated in the statute.

254.   As set forth above, Plaintiff is a member of a racial minority; Defendants Ortiz, Nesis and Rodriguez had an intent to discriminate against Plaintiff on the basis of his race; and the discriminatory treatment concerned one or more of the activities enumerated in Section 1981 – the right to enjoy equal protection under the law within the confines of Toyota Park, and in particular, the right to not have ticketing privileges denied for a discriminatory purpose and the right to not be subjected to false arrest.

255.   Plaintiff was treated differently by the Defendants Ortiz, Nesis and Rodriguez because of his Hispanic origin and/or Hispanic race, the fact that he was affiliated with Sector Latino, and because he had season tickets in Section 101, the designated seating section for Sector Latino.

256.   In particular, as noted above, Defendant Rodriguez harbored discriminatory feelings towards Hispanic member of Sector Latino, in part because Rodriguez disagreed with their passionate and aggressive "barra brava" style of supporting the Chicago Fire.   In particular, Defendant Rodriguez unfairly viewed members of Sector Latino, and by default Plaintiff as uncouth troublemakers.

257.   Defendants Ortiz and Nesis, not being accustomed to the "barra brava" style of supporting soccer teams viewed Plaintiff and his fellow Hispanic members of Section Latino as "gang like" troublemakers.

258.   As a result of Defendants Rodriguez, Ortiz and Nesis's prejudicial views and unsupported fears, they felt emboldened to mistreat him and did so to make an example of him to Chicago Fire fans and other members of Sector Latino.   In doing so, they treated Plaintiff differently that similarly situated non-Hispanic individuals.

259.   For example, as noted above, in comparison to Badr Tabbaq, who was a

reported instigator of the Post-Game Incident who fought with at least one Monterrey Security employee.

260.   Defendant Rodriguez was made aware of Mr. Tabbaq's misconduct but did not issue a 12 month stadium ban upon Mr. Tabbaq because Tabbaq was not a member of Sector Latino and was not perceived as being Hispanic.

261.   Plaintiff, by receiving a 12 month ban from Toyota Park as well as  12 month ban from all United States and Canadian based MSL games, was treated worse that Mr. Tabbaq who appears to have not suffered from any similar stadium ban.

262.   Plaintiff was also treated worse than a Caucasian Chicago Fire fan with the initials D.W. who, during the 2018 season, reportedly physically and verbally assaulted other Chicago Fire fans without being arrested and/or banned from Toyota Park.

263.   In one incident, which took place 2018, D.W., allegedly spit at a minor. This incident was published on Twitter using the hashtag of #cf97 which is a hashtag used by and associated with Tweets related to the Chicago Fire.

264.   In a second incident, which took place 2018, D.W. purportedly pushed up against a minor and became verbally abusive.  The father of the minor has complained via Twitter and this incident was published on Twitter using the hashtag of #cf97.

265.   According to one report on Twitter, on July 18, 2018, D.W. is alleged to have put his finger in the fact of a 15 year old while screaming "Fuck You."

266.   On June 29, 2018, a Chicago Fire fan posted that he feared for his safety at Toyota Park in the presence of D.W. and tweeted his concern to the Chicago Fire's official twitter account.

267.   Because Defendant Rodriguez is known to personally monitor the #cf97 hashtag on Twitter and/or engage subordinates to monitor the #cf97 hashtag, Rodriguez

43

was aware of D.W.'s acts misconduct, but declined to have D.W. banned from Toyota Park, in part because D.W. composes tweets that are favorable to one of the owners of the Chicago Fire and D.W. is Caucasian and not a member of Section Latino

268.   D.W., by and through his support of the ownership of the Chicago Fire, has threatened and intimidated Chicago Fire fans  who have vocally opposed the ownership of the Chicago Fire.  Examples date as far back as 2015.

269.   Another fan complained on Twitter that D.W. almost struck an infant with a flag and D.W. purportedly reported "too bad, you're in the supporters' section" after he was told by the fan in question to be more careful.

270.   D.W. has not received any ban from Toyota Park, let alone a 12 month ban.  Instead, he was

271.   D.W. was treated more favorably because of his race.

272.   In fact, on August 11, 2018, D.W. was allowed on the field of Toyota Park to be celebrated as being a referee associated with Chicago Fire Recreational Soccer.

273.   As a result of the aforementioned Defendants' conduct, Plaintiff has suffered damages in the form of the denial of his rights under the law.

274.   Further, as alleged above, Plaintiff was the only Chicago Fire fan detained before or during the May 20, 2018, Post Game Incident.

275.   Because Defendant Rodriguez wanted to disband and banish Sector Latino from Toyota Park and otherwise harbored a discriminatory animus towards supporters of Sector Latino and in particular toward Central American based supports, Rodriguez wanted to make an example of Plaintiff to justify banning the entirety of Sector Latino from Toyota Park.

276.   As a result of Defendants Rodriguez, Ortiz and Nesis's prejudicial views and unsupported fears, they felt emboldened to mistreat him and did so to make an

44

example of him to Chicago Fire fans and other members of Sector Latino.

277.   In doing so, they treated Plaintiff differently that similarly situated non-Hispanic individuals.   In particular, as a result of the combined misconduct of Defendants Rodriguez, Ortiz and Nesis, Plaintiff had his season tickets cancelled and received Plaintiff received a 12 month ban from Toyota Park, as well as all Canadian and U.S. based MLS stadiums.

278.   As part of Defendant Rodriguez's scheme, he caused Plaintiff to be issued a 12 month ban from Toyota Park and an MLS stadium, for the purpose of making an example of him.   Plaintiff, however, did not brawl with any Houston fans after the May 20, 2018, game and did not batter Defendant Ortiz.   Similarly, D.W., who arguably committed worse misconduct with minor children, did not face any similar bans.

279.   Because of the aforementioned Defendants' conduct, Plaintiff has suffered damages in the form of the denial of his rights under the law, including monetary damages, reputational harm, emotional distress and the costs of retaining counsel to defend him in criminal court.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendants Rodriguez, Ortiz and Nesis and he is entitled to compensation for his deprivations including, but not limited to, punitive damages and attorney's fees.

### Count IV - §1982 Claim vs. Defendants Ortiz, Nesis and Rodriguez

280.   Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

281.   Section 1982 states that:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

282.   Section 1982's protection of the right "to hold" property goes beyond mere title; it also includes the right to use one's property and protects a person's property from being unlawfully taken because of racial and national origin based animus.

283.   As set forth above, Defendants Rodriguez, Ortiz, Thompson and Nesis harbored a racial and national origin based animus toward Plaintiff, took action and discriminated against the Plaintiff because of his race, and deprived Plaintiff of his right to attend Chicago Fire Soccer games, and to enter Toyota Park because of Plaintiff's Hispanic origin and/or race.

284.   Plaintiff was treated differently by the Defendants Ortiz, Nesis and Rodriguez because of his Hispanic origin and/or Hispanic race, the fact that he was affiliated with Sector Latino, and because he had season tickets in Section 101, the designated seating section for Sector Latino.

285.   Plaintiff was treated differently by the Defendants Ortiz, Nesis and Rodriguez because of his Hispanic origin and/or Hispanic race, the fact that he was affiliated with Sector Latino, and because he had season tickets in Section 101, the designated seating section for Sector Latino.

286.   In particular, as noted above, Defendant Rodriguez harbored discriminatory feelings towards Hispanic member of Sector Latino, in part because Rodriguez disagreed with their passionate and aggressive "barra brava" style of supporting the Chicago Fire.   In particular, Defendant Rodriguez unfairly viewed members of Sector Latino, and by default Plaintiff as uncouth troublemakers.

287.   Defendants Ortiz and Nesis, not being accustomed to the "barra brava" style of supporting soccer teams viewed Plaintiff and his fellow Hispanic members of Section Latino as "gang like" troublemakers.

288.   As a result of Defendants Rodriguez, Ortiz and Nesis's prejudicial views

and unsupported fears, they felt emboldened to mistreat him and did so to make an example of him to Chicago Fire fans and other members of Sector Latino.

289.   As noted the prior Count, Defendants Rodriguez, Ortiz and Nesis treated Plaintiff differently that similarly situated non-Hispanic individuals.  In particular, as a result of the combined misconduct of Defendants Rodriguez, Ortiz and Nesis, Plaintiff had his season tickets cancelled and received Plaintiff received a 12 month ban from Toyota Park, as well as all Canadian and U.S. based MLS stadiums.

290.   Because of the aforementioned conduct of Defendants Rodriguez, Ortiz and Nesis, Plaintiff has suffered damages in the form of the denial of his rights under the law, including monetary damages, reputational harm, emotional distress and the costs of retaining counsel to defend him in criminal court.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendants Rodriguez, Ortiz and Nesis and he is entitled to compensation for his deprivations including, but not limited to, punitive damages and attorney's fees.

### Count V - § 1985(3) Claim vs. Defendants Ortiz, Nesis and Rodriguez

291.   Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

292.   Section 1985(3) states in part:

> If two or more persons in any State or Territory conspire or go . . . on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . .  or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived

47

may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

293.    Section 1985(3) affords a private right of action against persons who conspire to violate the rights of another person or another person's property.

294.    Plaintiff has stated a claim for the violation of his rights to equal protection as provided by Section 1985(3) because:  (a) he is a member of a protected class as a person of Hispanic origin; (b) he was similarly situated a non-Hispanic Houston Dynamo fan and a Caucasian Chicago Fire fan with the initials D.W.; (c) he was treated differently because of his Hispanic origin by Defendants Rodriguez, Ortiz and Nesis; and (d) these they acted against Plaintiff with discriminatory intent as detailed in the preceding two counts.

295.    As set forth above, Defendants Rodriguez, Ortiz and Nesis, named in this Count acted under color of law. Defendant Rodriguez, by way of his position of power with the Chicago Fire, allowed Defendants Ortiz and Nesis to realize that they were free to discriminate against Plaintiff for the reasons detailed in the preceding two counts.

296.    By declining to intervene to prevent Plaintiff from being falsely and maliciously prosecuted as a result of Defendant Ortiz's false report, Defendant Rodriguez tacitly approved the wrongful prosecution of Plaintiff.  On information and belief, via private mails, sent from Rodriguez's personal email, Rodriguez encouraged lower level Fire employees to encourage Defendant Ortiz's false report and the malicious prosecution of Plaintiff.

297.    As set forth above, Plaintiff had his rights to equal protection under the law denied and deprived based upon racist mistreatment and personal animus and has suffered damages in the form of the denial of his rights under the law, including monetary damages, reputational harm, emotional distress and the costs of retaining counsel to defend him in criminal court.

48

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendants Ortiz, Thompson and Nesis and he is entitled to compensation for his deprivations including, but not limited to, punitive damages and attorney's fees.

**Count VI - §1986 Claim vs. Defendants Rodriguez, Bubcz, Nesis and LeFevour**

298.  Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

299.  Defendants Rodriguez, Bubcz, Nesis and LeFevour knew that Plaintiff did not batter Defendant Ortiz on May 20, 2019.

300.  Defendants Rodriguez, Bubcz, Nesis and LeFevour also knew that Defendant Ortiz was attempting to cause Plaintiff to be maliciously prosecuted and wrongfully convicted.

301.  Despite having knowledge of the above misconduct, Defendants Rodriguez, Bubcz, Nesis and LeFevour failed to intervene to stop the wrongful prosecution of Plaintiff.

302.  Alternatively, Defendants Bubcz and LeFevour also knew that Defendants Ortiz, Rodriguez and Nesis were attempting to cause Plaintiff to be maliciously prosecuted and wrongfully convicted.

303.  Despite having knowledge of the above misconduct, Defendants Bubcz and LeFevour failed to intervene to stop the wrongful prosecution of Plaintiff.

304.  Because of the aforementioned Defendants' failure to intervene to cause Defendant Ortiz's false criminal charges to be dropped against Plaintiff, Plaintiff has suffered damages in the form of the denial of his rights under the law including, but not limited to, the denial of his liberty, reputational harm, emotional distress and the costs of retaining counsel to defend him in criminal court.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against

Defendants Rodriguez, Ortiz, Bubcz, Thompson, Nesis and LeFevour and he is entitled to compensation for his deprivations including, but not limited to, punitive damages and attorney's fees.

**Count VII - Class of One Claim vs. Defendants Ortiz, Thompson and Nesis**

305.   Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

306.   As set forth above, Defendants Ortiz, Thompson and Nesis sought to deprive Plaintiff of his rights to equal protection under the law based upon their personal animus toward him resulting from their interactions with him during the aforementioned "meet the team" event in 2017.

307.   Because of the aforementioned Defendants' conduct, Plaintiff has suffered damages in the form of the denial of his rights under the law, including, but not limited to, the denial of his liberty, reputational harm, emotional distress and the costs of retaining counsel to defend him in criminal court.

308.   As set forth above, Defendants Ortiz, Thompson and Nesis acted under color of law.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendants Ortiz, Thompson and Nesis and he is entitled to compensation for his deprivations including, but not limited to, punitive damages and attorney's fees.

**Count VIII – Fourth Amendment Excessive Force Claim vs. Kraft**

309.   Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

310.   As set forth above, Defendant Kraft acted under color of state law and committed excessive upon Plaintiff when he tripped him.

311.   Defendant Kraft, as a Village of Bridgeview employee, acted under color of

law.

312.     Defendant Kraft's physical conduct was not justified.

313.     Because of the aforementioned Defendant Kraft's conduct, Plaintiff has suffered damages in the form of the denial of his rights under the law, including, but not limited to, the denial of his liberty, emotional distress and physical harm.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendant Kraft and Plaintiff is entitled to compensation for his deprivations including, but not limited to, punitive damages and attorney's fees.

### Count IX - State Law Battery Claim vs. Defendant Kraft

314.     Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

315.     As set forth above, Defendant Kraft committed the tort of battery upon Plaintiff.

316.     Defendant Kraft's physical conduct was not justified.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendant Kraft and he is entitled to compensation for his injuries, including, but not limited to punitive damages.

### Count X - *Respondeat Superior* v. Village of Bridgeview

317.     Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

318.     Under Illinois law, employers can be liable for the negligent or willful acts of their employees if the acts occur in the course of their employment.

319.     Here, Defendants Kraft and Officer Pell were employed by the Village of Bridgeview and injured Plaintiff in the course of their employment.

320.     Defendant Kraft committed the tort of battery against Plaintiff when he

unjustifiably tripped Plaintiff and injured him.

321.   Defendant Officer Pell violated Illinois law by falsely arresting Plaintiff and causing him to be maliciously prosecuted.

**WHEREFORE**, to the extent Plaintiff prevails against Defendants Kraft and/or Officer Pell Plaintiff is entitled to have judgment entered in his favor against by the Village of Bridgeview in relation to the torts that were committed Defendants Kraft and Officer Pell and he is entitled to compensation including, but not limited to, punitive damages.

### Count XI - State Law Battery Claim vs. Perez

322.   Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

323.   As set forth above, Defendant Perez committed battery against Plaintiff in the manner in which Perez detained, restrained and lifted up Plaintiff.

324.   Defendant Perez's conduct was unlawful, excessive and otherwise unlawful.

325.   Plaintiff suffered physical injuries as a result of these Defendant Perez's actions.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendant Perez, and he is entitled to compensation for his injuries including, but not limited to, punitive damages.

### Count XII - State Law Battery Claim vs. Thompson

326.   Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

327.   As set forth above, Defendant Thompson battered Plaintiff pushing him while Plaintiff was detained inside the Toyota Park lock-up.

328.    Defendant Thompson's conduct was unlawful, excessive and otherwise unlawful.

329.    Plaintiff suffered physical injuries as a result of Defendant Thompson's actions.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendant Thompson, and he is entitled to compensation for his injuries including, but not limited to, punitive damages

### Count XIII – *Malicious Prosecution* vs. Defendants Ortiz, Nesis and LeFevour

330.    Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

331.    Defendants Ortiz, Nesis and LeFevour committed the tort of malicious prosecution by commencing or continuing a criminal proceeding against Plaintiff in the absence of probable cause and with malice.

332.    As detailed above, despite having knowledge that Ortiz and Nesis were lying about the depiction of Ortiz's interaction with Plaintiff on May 20, 2018, Defendant LeFevour refused to intervene to instruct Defendant Ortiz to drop his false battery charge against Plaintiff.

333.    Defendants Ortiz and Nesis, by their presentation of false witness statements, were the cause in fact and proximate cause of the unlawful and false charge.

334.    Notably, if Plaintiff had been wrongfully convicted based upon the false testimony of Defendant Ortiz, he could have been without legal recourse to take action against Ortiz as the Supreme Court has held that Section 1983 does not authorize a convicted person to assert a claim for damages against a police officer for giving perjured testimony at a criminal trial because witnesses are absolutely immune from damages liability based on their testimony. *See also, Curtis v. Bembenek*, 48 F.3d 281, 283-84

(7th Cir. 1995).

335.   At no time did she inform the prosecutor that she had doubts as to the veracity of Ortiz and Nesis's accounts of Ortiz's interaction with Plaintiff on May 20, 2018.  Instead, when Defendant Ortiz's credibility was attacked in open court during a particular court appearance, Defendant LeFevour contacted the assigned Assistant State's Attorney and indicated that Defendant Nesis was an eyewitness to the alleged battery.

336.   As discussed above, these Defendants knew that Plaintiff was innocent of the charge against me, but they chose to allow the criminal proceeding to continue, despite their moral and civil duty to report to the prosecutor that Defendant Ortiz and Nesis had falsely accused Plaintiff of battery upon Defendant Ortiz.

337.   As noted above, Defendant LeFevour was present in court on December 19, 2018, along with Defendants Ortiz and Nesis.

338.   Just prior to the assigned Assistance State's Attorney announcing to the court that he was going to dismiss the charges against Plaintiff, the assigned Assistance State's Attorney spoke Defendants LeFevour, Ortiz and Nesis outside of the courtroom.

339.   Defendant LeFevour questioned why the charge was going to be dropped and urged the assigned Assistance State's Attorney to reconsider his position.

340.   LeFevour asked the assigned Assistance State's Attorney - "why would you take the word [of Plaintiff] over the words of two decorated law enforcement officers?"

341.   Defendant LeFevour's question was not a mere comment, it was an active attempt to influence the continued unlawful prosecution of Plaintiff despite her knowing that both Defendants Ortiz and Nesis were willing to lie to conflict Plaintiff.

342.   By invoking the status of Defendants Ortiz and Nesis as law enforcement officers, Defendant LeFevour was attempting to invoke the well-know "Blue Wall of

54

Silence" to obtain a *favorable result* of her clients – the continued prosecution and conviction of Plaintiff. *See,* G. Chin & S. Wells, *The "Blue Wall of Silence" as Evidence of Bias and Motive to Lie: A New Approach to Police Perjury*, 59 U. Pitt. L. Rev. 233, 248-49 (1998)).

343. One District Court has described the "blue wall of silence" as follows:

> [T]his code requires that officers not report one another's misconduct to their supervisors, not stop such misconduct or criminal conduct, not testify against one another, and even assist a fellow officer to evade detection by the authorities.

*Klipfel v. Casali*, 2006 U.S. Dist. LEXIS 99835, *5 (N.D. Ill. June 8, 2016).

344. Defendant LeFevour wanted Plaintiff convicted to eliminate the prospect of a false arrest and/or malicious prosecution lawsuit and to minimize any claim predicated on excessive force.

345. Under no set of circumstances was it proper for Defendant LeFevour to think that she was protecting her client (Ortiz) from civil liability – by helping to wrongfully convict Plaintiff for a crime that he did not commit. Further, her desire to help Defendant Monterrey avoid or minimize liability, does not shield her from a malicious prosecution claim.

346. The same is true with regard to whether she can be shielded from liability to the extent she was helping to wrongfully convict Plaintiff for a crime that he did not commit – in order to avoid or minimize liability towards Defendants Nesis and Perez for their own independent torts.

347. Because Plaintiff (by and through his counsel) repeatedly expressed his innocence and urged Defendants Ortiz and Nesis to drop Ortiz's (by and through Plaintiff's counsel's interactions with Defendant LeFevour and Mr. Bentley, Defendants LeFevour, Ortiz and Nesis acted with spite and malice towards Plaintiff, all for the purpose of punishing Plaintiff for his zealous advocacy and to railroad him for a crime

he did not commit.

348.    In addition to having to hire a lawyer and miss work to attend at least four court appearances, Plaintiff suffered special injuries in the form of having his season tickets cancelled and being banned from Chicago Fire matches and Toyota Park for 12 months.

349.    Additionally, as a result of being subjected to a malicious prosecution, Plaintiff was banned from all MLS soccer matches across the United States and Canada.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendants Pell, Ortiz, Nesis and LeFevour and he is entitled to compensation for his injuries including, but not limited to, punitive damages.

## Count XIV – Intentional Infliction of Emotional Distress

## vs. Defendants Perez, Thompson, Ortiz, Nesis, LeFevour and Rodriguez

350.    Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

351.    The conduct of Defendants Perez, Thompson, Ortiz, Nesis, LeFevour and Rodriguez was extreme and outrageous.

352.    The allegations demonstrate that each Defendant intended that his or her conduct inflict severe emotional distress upon Plaintiff.

353.    The allegations demonstrate that each Defendant knew that there was a high probability that his or her conduct would inflict such distress.

354.    Defendants conduct caused Plaintiff to suffer severe emotional distress.

355.    As to Defendants Perez and Thompson, Plaintiff suffered from nightmares and flashbacks with regard to the manner in which they physically assaulted him and in particular how Defendant Thompson touched him and spoke to him while he was detained in the lockup.

356.   Defendants Ortiz, Nesis, LeFevour and Rodriguez subjected Plaintiff to extreme and outrageous conduct by causing or allowing false charges to remain against him.  In particular, Plaintiff was unable to sleep for days after his false arrest, and could not sleep well in the days leading up to each court appearance.  Plaintiff feared that he would lose his job.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendants Perez, Thompson, Ortiz, Nesis, LeFevour and Rodriguez.  Plaintiff he is entitled to compensation for his injuries including, but not limited to, punitive damages.

**Count XV - *Respondeat Superior* For State Law Claims v. Monterrey Security**

357.   Plaintiff incorporates the above Paragraphs as if fully set forth within this Count.

358.   Under Illinois law, employers can be liable for the negligent or willful acts of their employees if the acts occur in the course of their employment.

359.   Here, Defendants Perez and Thompson were employed by Monterrey Security committed various torts and constitutional violations against Plaintiff in the course of their employment.

360.   Defendant Thompson also committed the tort of intentional infliction of emotional distress.

361.   Additionally, Defendants Ortiz and Nesis caused Plaintiff to be falsely arrested and subjected to a malicious prosecution.  They also committed the tort of intentional infliction of emotional distress.

**WHEREFORE**, Plaintiff is entitled to have judgment entered in his favor against Defendant Monterrey Security in relation to the torts committed by Defendants Perez, Thompson, Ortiz and Nesis, and he is entitled to compensation including, but not limited to, punitive damages.

***Plaintiff demands a jury on all counts where a jury trial may exist.***

Respectfully Submitted,

Counsel for Plaintiff

<u>/s/ James C. Vlahakis</u>
James C. Vlahakis
Sulaiman Law Group, Ltd.
2500 South Highland Avenue, Suite 200
Lombard, IL 60148
(630) 581-5456
jvlahakis@sulaimanlaw.com

**Certificate of Service**

I certify that I filed the above document with the Clerk of the Court on April 27, 2019, and that the ECF system maintained by the Clerk will automatically transmit this filing to all counsel of record.


_/s/ James C. Vlahakis_