**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ABRAHAM CALDERON, | |
| Plaintiff, | |
| v. | Case No.:18-cv-08277 |
| THE VILLAGE OF BRIDGEVIEW, ILLINOIS; et al, | Judge John Z. Lee |
| Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION MOTIONS TO DISMISS**

Plaintiff submits this Response to Defendants Jesse Ortiz, Daniel Nesis, Terry Thompson, Cesar Perez, and Genevieve Marie Lefevour's Motion to Dismiss (Dkt. 74) and Defendant Nelson Rodriguez's Motion to Dismiss (Dkt. 80) his Third Amended Complaint ("TAC"):

## I. Introduction

Plaintiff's factual allegations are well-grounded in law and fact. After Plaintiff attended a Chicago Fire soccer match at Toyota Park on May 20, 2019, he was wrongfully arrested, framed and prosecuted for a crime he did not commit. Defendants Jesse Ortiz and Daniel Nesis, two off-duty law enforcement officials employed by Monterrey Security Consultants, Inc. ("Monterrey"), caused Plaintiff to be falsely arrested for allegedly battering Ortiz when no such crime occurred. TAC ¶¶10-12, 15. The cellphone videos show that Plaintiff did not batter Ortiz. ¶¶41-47Ortiz and Nesis attempted to arrest Plaintiff moments before a post-match incident that took place between Chicago Fire fans and fans of the Chicago Fire's opponent, Houston Dynamo. ¶¶14-15 (hereafter the "Post-Match Incident"). Ortiz and Nesis sought to arrest and convict Plaintiff for a crime that *he did not commit* because they harbored animosity and ill will toward Plaintiff based upon an incident that took place at Toyota Park in September of 2017. TAC ¶¶16, 25, 40-44

In contrast to how Ortiz and Nesis treated Plaintiff, Ortiz and Nesis allowed Badr Tabbaq, a Houston Dynamo fan and the reported "instigator" of the Post-Game-Incident to go free despite the fact that cellphone videos show that Tabbaq got into a physical altercation with one or more Monterrey Security employees. ¶¶105-11. Cellphone videos demonstrate that several persons in the parking lot made physical contact with employees of Monterrey Security but were released after being detained by Monterrey Security. ¶112. Defendant Michael Babacz, an off-duty Chicago Police Officer, was employed by Major League Soccer ("MLS") as a "Soccer Security Agent" and present at Toyota Park during the Post-Game Incident. ¶¶48-50, 53. Babacz wore Chicago Fire Soccer credentials on May 20, 2018, which identified him as being "credentialed" (allowed to work game-day operations) by the front office of the Chicago FireBabacz filed the Incident on a cellular phone. ¶54. Babacz took cellphone videos of the Post-Game Incident and his videos may depict Plaintiff's interactions with Ortiz. ¶¶55-56.

The inept manner in which Monterrey Security and the Chicago Fire staff responded to the Post-Game-Incident left Rodriguez (the CEO of the Chicago Fire Soccer Club) purportedly without any participants to punish – except Plaintiff – *who was arrested just prior to the start of Post-Game-Incident*. ¶¶112, 185-87. According to Rodriguez, Sector Latino has never admitted any responsibility of any of its members in any violations of the so-called "fan code of conduct":

> In one particular incident, the number of participants in the incident was large. It was more than a few people, many of whom were trying to obscure their faces, many of whom were wearing a sweatshirt identifying them as members of Sector Latino. The leadership was given every opportunity to bring forth those who violated the code of conduct. They did not.
>
> \* \* \*
>
> So we made good-faith efforts, but in the end what I've said and will continue to say, we cannot allow a group to hide or allow to be hidden within them, those that endanger the safety of others. From our perspective, we gave multiple opportunities for the leadership to step up and they didn't.

TAC ¶185.

While Plaintiff is not alleging that Rodriguez *instructed* Ortiz and Nesis to falsely arrest him, Rodriguez has repeatedly stated that he has authority to expel from Toyota Park and has implied that he authority over the Village of Bridgeview and Monterrey Security to implement expulsions, investigations and bans. TAC ¶¶32-33,159-60, 180. Rodriguez had an ax to grind with Sector Latino, a fan/supporter group largely comprised of persons of Mexican American decent. ¶¶31, 163, 258, 275-76, 278, 288.[1] Plaintiff's false arrest at the hands of Ortiz and Nesis gave Rodriguez the perfect opportunity to conspire with them and others to single out Plaintiff to strike fear in the heart of members of Sector Latino. ¶¶157, 173, 183-86, 188, 258, 275-76, 278. On or about May 20, 2018, upon learning of Plaintiff's arrest, Rodriguez conspired with Ortiz and Nesis and Monterrey's outside counsel, Defendant Genevieve Marie LeFevour ("LeFevour") to railroad Plaintiff for a crime he did not commit. ¶¶163-73. Rodriguez did so despite learning that videos show that Plaintiff did not batter Ortiz.

Defendants' Motions to Dismiss contain hyper-charged and melodramatic rhetoric.[2] The fact that Defendants Ortiz and Rodriguez are also of Hispanic or Latino origin does not entitle them to dismissal, much less an inference that they cannot discriminate against people of Hispanic origin.[3] *See, e.g., St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). The Complaint

---

[1] Members of Sector Latino support the Chicago Fire during games by exuberantly dancing, chanting and playing drums and horns. Sector Latino's passionate manner of support is generally referred to as a "barra brava" style of support, which is a somewhat aggressive, machismo derived manner of support. TAC ¶174. See, e.g., https://www.bbc.com/news/av/magazine-27668750/la-barra-brava-why-us-footballfans-chant-in-spanish TAC ¶175. Barra brava style support originated in Argentina and spread throughout the Americas. ¶176. These groups were often labeled Barras, a term that is equivalent to the term "gang" in certain South American countries. *Id.*

[2] Dkt. 75, ¶3 ("Plaintiff should have never been made these claims in the first place as they are patently frivolous and hinge on outrageous accusations of misconduct conjured out of whole cloth by Plaintiff and his attorney."); Dkt. 81, p. 1 (stating that Plaintiff's race discrimination "theory is unhinged" and p. 2 ("Plaintiff's counsel has been warned many times about the impropriety of his allegations. Yet plaintiff continues to publicly malign Mr. Rodríguez as a racist."). Plaintiff will not be baited into a tit-for-tat.

[3] Rodriguez's parents are from Argentina. http://www.nasl50th.com/nelson-rodriguez/

clearly alleges that Rodriguez disliked the members of Sector Latino, a Hispanic based supporters group – because of the manner in which the members expressed their love for the Chicago Fire. Rodriguez knows that Plaintiff is a member of Sector Latino. The boisterous manner in which Sector Latino support Chicago Fire Soccer did not sit well with Rodriguez's Argentina based national origin and his vision of the ideal Chicago Fire fan. Rodriguez could and should have reached out to Monterrey Security, Defendant Ortiz's employer to ask why Ortiz was continuing to accuse Plaintiff of battering him when cellphone video and security camera footage demonstrated that Plaintiff did not batter Ortiz. TAC ¶159. Rodriguez did not want justice to occur – he wanted to make an example out of Plaintiff. 157, 173, 183-86, 188, 258, 275-76, 278.

Defendants cannot prevail under their arguments that they were not obligated to help an otherwise innocent man. That is not what is being alleged. Instead, Plaintiff was railroaded. Notably, in June of 2018, Defendant LeFevour, outside counsel for Monterrey learned that cellphone videos exonerated Plaintiff and undermined the veracity of Ortiz's account of his interaction with Plaintiff on May 20, 2018. TAC ¶¶ 196-200. She refused to act to cause Ortiz (her client) to drop his false charge of battery. TAC ¶¶199, 202. As a lawyer, LeFevour had a professional obligation to prevent her client from knowingly submitting perjured testimony. TAC ¶203. After Ortiz's credibility was attacked in criminal court by Plaintiff's counsel, LeFevour reached out to the prosecutor and indicated that Nesis was an eyewitness to the alleged battery, despite knowing that Nesis was lying. TAC ¶¶204, 207-11.

## II.  Standard of Review

FRCP 8 does not require hyper-technical pleading. Rule 8(a) simply "require[s] plaintiffs to plead *claims* rather than facts corresponding to the elements of a legal theory." *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017). Plaintiff's claims are that he was subjected

to wrongful arrest and excessive force, and that he is entitled to compensation for this misconduct. Defendants' motions contain inapposite cases and cases decided at the summary judgment stage.

A plaintiff can survive a motion to dismiss by pleading circumstantial allegations that allow for a plausible inference of such an agreement. *Geinosky v. City of Chicago*, 675 F3d 743, 749 (7th Cir. 2012). Defendants' motions to dismiss ignore that Plaintiff is only required to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility is not a high hurdle."[I]t is manifestly inappropriate . . . to demand that complaints contain all legal elements (or factors) plus facts corresponding to each." *Chapman*, 875 F.3d at 848. This Court should accept well-pled allegations <u>and</u> draw *all reasonable inferences <u>in favor of Plaintiff</u>*. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.". *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff must receive "the benefit of imagination, so long as the hypotheses are consistent with the complaint.'" *Chapman*, 875 F.3d at 848 (quoting *Twombly*, at 563). A common sense analysis should apply. Whether a "claim is sufficiently plausible to survive a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* Plaintiff has certain flexibility in opposing a Rule 12(b)(6) motion. *Geinosky*, 675 F.3d at 745 n.1. Plaintiff is free to assert new facts in opposing a motion to dismiss. *Early v. Bankers Life and Casualty Co*., 959 F.2d 75, 79 (7th Cir. 1992).

A motion to dismiss should only be granted if a complaint fails "to raise a right to relief *above the speculative level*." *Twombly,* 550 U.S. at 555 (emphasis supplied). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be

speculative." *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015). Defendants ignore many

well-pled allegations in an effort to preview their summary judgment defenses to this Court.

### III.  Summary and Recap of Key Facts

This case is unlike traditional false arrest and excessive force cases because Plaintiff has

obtained cell phone videos demonstrating that he did *not* batter Defendant Ortiz as Ortiz had

alleged. TAC ¶¶35, 41-42. The alleged battery did not take place as demonstrated by the cell phone

video *and security camera footage taken from cameras attached to Toyota Park. Id. ¶*44.[4] The

cellphone video shows another employee, Defendant Daniel Nesis, also employed by Monterrey,

urging other Monterrey Security employees to arrest Plaintiff despite the fact that Plaintiff did not

commit a crime.  Both Ortiz and Nesis are employed in law enforcement (as are Babacz and

Defendant Terry Thompson, a Monterrey employee). As part of a "Code of Blue Silence",

Defendants Ortiz and Nesis urged Defendant Officer Pell to falsely arrest Plaintiff. TAC ¶224-26,

230-40.[5] Video evidence shows that Plaintiff did not batter Ortiz. Moreover, the video does not

depict Plaintiff being "nose-to-nose" with Ortiz as argued by Rodriguez. Dkt. 81, p. 3. Rather, the

video image shows that Plaintiff is several inches taller than Ortiz.[6] Bubacz and a Chicago Fire

employee took cellphone videos of the post-game incident between Chicago Fire fans and visiting

---

[4] Defendants Ortiz and Nesis conspired to falsely accuse Plaintiff of battering Ortiz despite the existence of security camera video footage from cameras attached to Toyota Park. TAC ¶¶15, 24.

[5] Rodriguez has criticized Plaintiff for failing to explain "why he 'interacted' with [Defendants Ortiz and Nesis] during the [post-game] incident" on May 20, 2018. Dkt. 81, fn. 3). Plaintiff is not required to explain his interaction other than to say that his interaction with Ortiz and Nesis was not unlawful nor did his interaction pose a risk of harm to either Defendant. Having said that, Plaintiff reportedly explained his behavior when he was interviewed by Officer Pell.  TAC ¶236.

[6] Because Defendants Ortiz and Nesis had no legal right to arrest Plaintiff, Plaintiff was well within his rights to flee *to avoid their illegal conduct*. The end of the video demonstrates how Defendant Ceasar Perez pursued Plaintiff. TAC ¶¶46-47. Defendant Mike Bubacz, a moonlighting Chicago Police Officer (originally sued as an unknown "Soccer Security Agent"), is also depicted in this video as he attempts to give chase after Plaintiff. TAC ¶47. A second video depicts Plaintiff being pursued by Defendant Perez and in this video Plaintiff is tripped by Defendant Mark Kraft. TAC ¶¶65-66.

fans from the opposition team, the Houston Dynamo. TAC ¶¶48-58, 113-17, 121-23, 145. Bubacz and other currently unknown individuals created a report about the Post-Game Incident. On information and belief, the document includes references to Plaintiff's arrest. ¶60.[7] Bubacz's response to the TAC is due on August 12, 2019.

It is implausible for Rodriguez to claim that a CEO of a major sports franchise would not learn of a fan allegedly battering a security guard.[8] Rodriguez was committed to eliminating Sector Latino and he knew that Plaintiff was a member of Sector Latino. TAC ¶¶177-79. In part, Rodriguez disliked Sector Latino who have engaged in a chant that Rodriguez appears to find to be homophobic. TAC ¶¶180-82. Rodriguez also harbored discriminatory feelings towards Hispanic member of Sector Latino, in part because Rodriguez disagreed with their passionate and aggressive "barra brava" style of supporting the Chicago Fire. TAC ¶286. In particular, Defendant Rodriguez unfairly viewed members of Sector Latino, and by default Plaintiff as uncouth and

---

[7] Bubacz was a defendant in a $100,000 settlement where he admitted to firing his gun seven times at civilian. https://www.chicagotribune.com/investigations/ct-chicago-police-shootings-no-gun-20160914-story.html See also, Bubacz's Answer to Complaint in the case of *Stevens v. Bubacz*, Dkt. 15, 13-cv-04446 (N.D. Ill.) (attached as Exhibit A). Bubacz's employment by MLS as a "Soccer Security Agent" is questionable given the fact that has been subject to numerous excessive force claims. https://cpdp.co/officer/3191/michael-bubacz/.

[8] On information and belief, Rodriguez was present at Toyota Park on May 20, 2018. TAC ¶143. Even if Rodriguez was not present, he learned of Plaintiff's arrest on that day. Plaintiff's counsel also knows that Rodriguez learned of the arrest in a post-match report prepared by a subordinate. While the identity of the Fire employee is not know at this time, it is plausible that the employee could have been John Urban, Chicago Fire Soccer Club's COO. ¶145. The latest Rodriguez would have learned from Urban would have been on May 30, 2018, when Plaintiff's counsel mailed Urban the exonerating cellular videos. ¶¶145-48,161-62. But to be clear, Rodriguez was made aware of the cellphone videos no later than June 22, 2018, when Plaintiff's counsel wrote to Rodriguez and asked him to look into having the false charged dropped. ¶149. In part, the email informed Rodriguez that counsel would seek records "to determine if anyone went 'off line' so-to-speak to avoid future FOIA requests relative to communications with the Village."). Within hours, Rodriguez lawyered up. Conflicting stories have emerged regarding whether all outside security camera video footage from Toyota Park on May 20, 2018, was preserved. ¶¶15, 24, 27, 29, 133-42. Given Rodriguez's stated position that he wanted to hold the participants in the Post-Game Incident accountable, it would extremely negligent for Rodriguez and any entity with access and/or charged with maintaining the security cameras to allow the videos to be overwritten.

"gang like"[9] troublemakers. *Id.*  Rodriguez was unhappy with members of Sector Latino failing to turn themselves in for their roles in the Post-Game Incident. Consistent with the allegations of the TAC, to make up for the Monterrey employees and the Fire's game day operations employees failing to detain or identify any members of Sector Latino in the Incident, Rodriguez opportunistically used Plaintiff's arrest to serve as an "example" to the unidentified members of Sector Latino *and* to help justify Rodriguez's actions in disbanding Sector Latino. TAC ¶¶157, 183-86, 258, 275-76, 278, 299-301, 304. According to Rodriguez, "I don't lose any sleep over the decision that we made" relative to disbanding Sector Latino.[10] "We gave Sector Latino various opportunities to correct its behavior. It continued and our decision was made. We won't change. We will always put fan safety first." *Id.*

Despite knowing that Plaintiff did not batter Ortiz, Defendant Rodriguez not contact the Cook County State's Attorney's Office to inform the assigned Assistant State's Attorney that Plaintiff was being wrongfully prosecuted because Rodriguez wanted Plaintiff to be convicted to help further his plan to rid Toyota Park of Sector Latino. *See, e.g.,* TAC ¶¶157, 183, 192-93, 196-214, 275. Rodriguez's Motion to Dismiss completely ignores the fact that he had an active role in the dismantlement of Sector Latino – a supporters group greatly disliked by Rodriguez - following the post-game incident that took place on May 20, 2018. TAC ¶¶174-78, 181-85.  Because Rodriguez wanted to disband and banish Sector Latino from Toyota Park and otherwise harbored a discriminatory animus towards supporters of Sector Latino and in particular toward Central American based supports, Rodriguez wanted to make an example of Plaintiff to justify banning

---

[9] Multiple sources have stated that Rodriguez has referred to Sector Latino as "gang like" in closed door meetings with other Chicago Fire fans where the meetings were convened to deal with the fall out of Rodriguez's banning of Sector Latino and cancelling season tickets for its members – even members who did not attend the May 20, 2018, match. A majority of these meetings were recorded.

[10] https://www.prosoccerusa.com/mls/chicago-fire/general-manager-nelson-rodriguez-answers-questions-about-sector-latino-ban/

the entirety of Sector Latino from Toyota Park. ¶275. As a result of Rodriguez, Ortiz and Nesis's prejudicial views and unsupported fears, they felt emboldened to mistreat him and did so to make an example of him to Chicago Fire fans and other members of Sector Latino. ¶276.

Rodriguez has the power to influence Monterrey Security as he clearly informed Chicago Fire fans that he wielded the power to remove them from Toyota Park if they uttered a certain Spanish pejorative term with alleged homophobic connotations. TAC ¶¶159-60, 179-80. With the powers that Rodriguez wielded, allowed and wanted Plaintiff to prosecuted to teach Plaintiff and others like him a lesson, and to help Rodriguez orchestrate the ouster of Section Latino from Toyota Park. TAC ¶¶173, 186-88.[11] Rodriquez reiterated his power to control fans when he asked fans observing the chant to "advise stadium security so we can handle them as well."[12] Rodriquez admitted stayed informed regarding the ejection of two fans who allegedly uttered the "chant".[13] When Rodriguez was asked to describe the "decision making process when a fan is identified for ejection", he gave the following answer that demonstrates that the Chicago Fire Soccer Club's front office (which he oversees) has a role in stadium security:

> [I]t could be [Chicago Fire] office staff that identifies the individual that's causing what's called an "infraction." It could be stadium security staff. Or it could be another fan who's watching. And then depending on the severity the infraction *we work to figure out what to do*. When those fans who instigated the fight were identified, they were given the opportunity to [say], we didn't do it we didn't do it, whatever, and then *we worked* with the league office to issue the one year ban. Because that's just behavior *we cannot have*.

---

[11] Given Rodriguez's duties as the Chicago Fire's CEO and his involvement in the eradication of Sector Latino, he cannot argue in good faith that he did not know about Plaintiff's arrest and prosecution. For example, Rodriguez has publically stated that he has the ability to control and influence the actions of Monterrey Security. Rodriguez discussed his powers during pre-game speech to Chicago fans where he stated that if fans were observed uttering an allegedly "inappropriate and offensive chant", they would be "subject to removal." TAC ¶180.

[12] https://www.chicagotribune.com/news/columnists/kass/ct-chicago-fire-anti-gay-soccer-chant-kass-0804-20160803-column.html

[13] https://www.hottimeinoldtown.com/2017/12/12/16718502/cf97-one-on-one-with-nelson-rodriguez

*Id*. (emphasis supplied). Further, according to Rodriguez:

> Look, *we've* ejected fans for disorderly conduct, for being drunk. They hadn't been in Section 8. The fans that were banned for a year because they instigated a fight, they were not in Section 8. So, *we want* everyone to have a good time.

*Id*. (emphasis supplied). Thereafter, Rodriguez spoke of Chicago Fire's "zero tolerance" policy relative to ejecting fans who utter the phrase. *Id.* Rodriguez went on to say that "[the chant] seeped back in a little bit, which is why we had to eject those fans. And we have to continue to be vigilant about that." *Id*. Rodriguez repeated that his staff would assist in response to security concerns: "I would say, if a fan feels [threatened], they could tell us, tell stadium personnel, and we'll handle it." *Id*. On July 3, 2018, Rodriguez discussed how he handled the "Fan Code of Conduct". "Last year, we kicked out seven members for an entire year. But when members of the leadership violate the Fan Code of Conduct and are involved in attacks, then they leave us no other choice."[14] During a live "media roundtable", Rodriguez explained his thought process relative to an "incident" on Saturday 21, 2018, where a group of fans "went into, uh, my words, . . . a prohibited section . . . [that] potentially endangered those around them." Describing his powers, Rodriguez used phrases like "we need to review what happened, why it happened, who was involved in what happened. We have to review security's response and preparation for that incident. And I don't think it's appropriate for me to give an opinion until that review is concluded."[15]

Rodriguez's public statements undermine his self-serving argument which suggests that he is powerless to impact how fans are subject to ejection and stadium bans. Rodriguez had personal knowledge of Plaintiff's innocence by and through the transmission of a cellphone video that depicted Plaintiff not battering Defendant Ortiz. TAC ¶¶161-62. In particular, the cellular video

---

[14] https://www.chicagotribune.com/90minutes/ct-90mins-fire-gm-rodriguez-sector-latino-doesnt-exist-for-us-anymore-20180703-story.html

[15] https://www.chicago-fire.com/post/2018/07/24/watch-chicago-fire-president-and-general-manager-nelson-rodr-guez-hosts-july-media (starting at 34:45 min. mark and continuing to the 36:00 min. mark).

was emailed to John Urban, the Chicago Fire's Chief Operating Officer, on May 30, 2018. ¶145. It is highly *plausible* that the video was forwarded to Rodriguez given his level of involvement with Section Latino's post-game ban. ¶¶147-48, 185. It would be *highly implausible* for a CEO of a major sports to not be aware of a post-game arrest, especially where there was an incident between opposing fans close in time to the arrest. Further, Rodriguez monitors is known to personally monitor the #cf97 hash-tag on Twitter and/or engage subordinates to monitor the Chicago Fire's designated #cf97 hash-tag. ¶267. Rodriguez is well aware of what happens under his watchful eye and by his own words he knew a great deal about the Post-Game Incident.[16] In fact, Rodriguez and his staff hosted meetings at Toyota Park before and after the Incident.[17]

How could Rodriguez make these statements if he was not present at Toyota Park on May 20, 2018? As both the general manager of the soccer team and CEO of Chicago Fire Soccer Club (the organization), it would be implausible for Rodriguez to not attend the May 20, 2018, soccer match. Rodriguez's East facing office windows overlook the parking lot where Plaintiff was arrested and the post-game incident unfolded. Alternatively, it would be implausible and irresponsible for could Rodriguez to make these statements if he had not viewed extensive video footage of the events leading up to (and including) the post-game incident.

Worse yet, because of Plaintiff's ties to Sector Latino and his of Mexican ancestry, he was treated him worse than the similarly situated non-Hispanic Houston Dynamo who interacted with Monterrey Security during the on May 20, 2018, during Post-Game Incident. TAC ¶¶ 189, 259-

---

[16] TAC ¶ 185 (citing https://www.prosoccerusa.com/mls/chicago-fire/general-manager-nelson-rodriguez-answers-questions-about-sector-latino-ban/)

[17] https://www.chicago-fire.com/post/2018/07/24/watch-chicago-fire-president-and-general-manager-nelson-rodr-guez-hosts-july-media (starting at 22:44 minute mark). In fact, Rodriquez, who hosted meeting at Toyota Park after the Incident, said the following: "Section was privy to every meeting with Sector Latino and every decision." Starting at 23:01 mark).

60. Plaintiff was also treated worse than least one other Caucasian fan who allegedly assaulted no less than two minors during the 2018 season. In particular, Ortiz, Nesis and Rodriguez purposefully declined to cause a Caucasian fan ("D.W.") to be arrested for allegedly assaulting and/or battering minors during Chicago Fire matches. ¶¶ 189-90, 262-66. In particular, Rodriguez was aware of D.W.'s acts misconduct, *but declined to have D.W. banned from Toyota Park*, in part because D.W. composes tweets that are favorable to one of the owner of the Chicago Fire, D.W. is Caucasian, and is not a member of Section Latino. ¶ 267. Further, D.W., by and through his support of the ownership of the Chicago Fire, has threatened and intimidated Chicago Fire fans who have vocally opposed the ownership of the Chicago Fire. *Id*. Examples date as far back as 2015. ¶ 268. At least one fan has complained on Twitter that D.W. almost struck an infant with a flag and D.W. purportedly reported "too bad, you're in the supporters' section" after he was told by the fan in question to be more careful. ¶ 269. Despite the above enumerated acts of misconduct, D.W. has not received any ban from Toyota Park, let alone a 12 month ban like Plaintiff. ¶ 270. Instead, D.W. was treated more favorably by Rodriguez and the Chicago Fire Soccer Club because of his Caucasian race. ¶ 271. On August 11, 2018, D.W. was allowed on the field of Toyota Park to be celebrated as being a referee associated with Chicago Fire Recreational Soccer. ¶ 272. D.W.'s favorable treatment by Rodriguez and the Chicago Fire Soccer Club, despite his reported acts of misconduct, demonstrates that Plaintiff was unfairly singled out by Rodriguez.

*It is not plausible* or lawful for Rodriguez turn a blind eye to evidence which demonstrates that an innocent man has been framed. Further, Rodriguez cannot bury his head in the sand and claim he was not aware of the exonerating cellphone video because he was informed of the existence of the video in an email sent to him on June 22, 2018. TAC ¶144. Simply stated, Rodriguez helped cause Plaintiff's civil rights to be violated because in his capacity as the

President and CEO of Chicago Fire Soccer, he refused to intervene with Monterrey Security (the security contractor at Toyota Park) to cause Defendant Ortiz's false charges to be dropped against Plaintiff. TAC ¶¶ 163-64. Plaintiff suffered a major consequence of the wrongful prosecution, he was banned from the confines of Toyota Park for one year, and subject to arrest if he returned to Toyota Park during said 12-month period. ¶¶ 166-67. Plaintiff was also banned for 12 months from all Major League Soccer ("MLS") matches in the United States and Canada as a result of his Toyota Park ban. ¶¶ 261, 276-77.

To recap, because of Defendant Rodriguez's prejudicial views and unsupported fears of the largely Mexican based member of Sector Latino, he caused and/or allowed Plaintiff to be prosecuted to teach Plaintiff and others like him a lesson and to help Rodriguez orchestrate the ouster of Section Latino from the confines of Toyota Park. TAC ¶¶173, 275-76, 278. Again, Plaintiff, did not brawl with any Houston fans after the May 20, 2018, game and did not batter Ortiz. ¶278. D.W., however, who arguably committed worse misconduct with minor children, did not face any similar bans. *Id*. Plaintiff is afforded the benefit of the doubt at the pleading stage:

> "Plausibility" in does not imply that the district court should decide whose version to believe, or which version is more likely than not . . . it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.

*Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Whether a plaintiff will ultimately prevail is not the proper standard of review: "[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Id*. (emphasis in original).

## IV. Argument

Defendants are critical of certain allegations being made on "information and belief." Dkts. 75 (p. 2); 81 (pp. 4-5, 9). "[P]leading 'on information and belief' is permissible '[w]here pleadings

concern matters peculiarly within the knowledge of the defendants.'" *Lucas v. Ferrara Candy Co*., 2014 U.S. Dist. LEXIS 99600, *18-*19 (N.D. Ill. July 22, 2014) (quoting *Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005)). As this Court has recognized, in denying a motion to dismiss, "without discovery, Plaintiffs are very unlikely to uncover facts indicating Ferrara made the alleged request and REM and LP complied with it." *Id*. *19. A common sense approach to analyzing the TAC should recognize that a citizen who has been falsely arrested may false nearly insurmountable odds in trying to uncover the specific misdeeds and agreements of the subject defendants where it is widely recognized that law enforcement officials often hide behind a "Code of Silence":

> [T]his code requires that officers not report one another's misconduct to their supervisors, not stop such misconduct or criminal conduct, not testify against one another, and even assist a fellow officer to evade detection by the authorities.

*Klipfel v. Casali*, 2006 U.S. Dist. LEXIS 99835, *5 (N.D. Ill. June 8, 2016). Virtually all of the Defendatns in this case are moon-lighting law enforcement officials. It is well documented that law enforcement officials protect each other even in the face of illegal conduct. See, e.g., *United States v. Ambrose*, 740 F.2d 505, 521 (7th Cir. 1984), *abrogated on other grounds, U.S. v. Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989) (Judge Harlington Wood, dissenting, quoting from district judge Paul Grady's comments at sentencing).

Numerous examples of this code exist.[18] The case of *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) provides a chilling description of the notorious circumstances involving the wrongful prosecution of teenager George Jones for the rape and murder of Sheila Pointer, a 12

---

[18] *See, e.g., Simon v. City of Naperville*, 88 F.Supp.2d 872, 876-77 (N.D. Ill. 2000) (denying summary judgment, in part: "Ms. Simon argues that a "code of silence" among police officers, combined with threats of retaliation for invoking an anti-harassment policy, deprived the policy of its effectiveness."); *McLin v. City of Chicago*, 742 F. Supp. 994, 998-1001 (N.D. Ill. 1990) (where Judge Rovner denied a motion to dismiss a failure to discipline claim where the plaintiff cited to multiple court opinions that discussed the existence of a code of silence relative to Chicago police officers).

year old girl. *Id.* at 988. Jones, a high school senior, was the editor of his school newspaper and was nick-named the "Bookworm" by his classmates. Jones was the son of a Chicago policeman and planned to join the Air Force upon graduation from high school and afterward attend college. *Id*. at 988-991. The police officers were unsuccessful in their efforts to have the deceased girl's 10-year old brother identify the assailant and officers prepared two memorandum regarding the non-identification in the police officers' "street files" (one memo provided an accurate description of the boy's failure to identify Jones, a second memo contained falsehoods and a third "unofficial" memo contained Officer Frank Laverty observations which called into question the victim's identification of Jones). *Id.* at 988, 990-91. All three memos were "sequestered" in the officers' "street files" and the "street files" were not provided to the prosecutors. *Id*. Officer Laverty was threatened by a fellow officer if he testified to his observations at trial. *Id*. at 990-91. Later, when another similar rape and murder occurred, and the perpetrator was caught, Officer Laverty prepared a memo which suggested that the perpetrator of the second rape/murder had killed Sheila Pointer. *Id*. at 991. When Officer Laverty suggested that the perpetrator of the second rape/murder should be placed in a line-up for the first victim's brother to possibly identify, his request was denied, on the basis that the victim's brother was not competent to make an identification. *Id.* Laverty's supervisor also lied to Laverty by falsely stating that due to the victim's brother's incompetence the prosecution of Jones had been abandoned. *Id*. Laverty prepared an additional memorandum, but the report was placed in his supervisor's desk and not tendered to the police. *Id*. Thereafter, a laboratory technician determined that Mr. Jones had different seamen and blood types from the types identified in the first victim's underwear. *Id*. The technician omitted this information from her official report. The technician also failed to include a report which suggested that hair samples did not belong to Jones. *Id*.  Jones was exonerated by Laverty's "honesty":

> The spring of 1982 arrived and the trial against George Jones began. A newspaper carried a report of the trial. Laverty read it with astonishment; Griffith had told him that the prosecution had been abandoned. Laverty went to Deas and asked him why an innocent person was being prosecuted. Deas replied that if Jones was innocent, the jury would acquit him. After calling the court where Jones was on trial and being referred to counsel, Laverty told Jones's lawyer about the exculpatory information secreted in the "street files." The lawyer promptly relayed Laverty's disclosures to the judge, who declared a mistrial. Shortly afterward the state's attorney dropped all charges against Jones.

*Id*. As a result of his testimony, Laverty was "transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples." *Id*. 991-92.

The defendant police officers who were involved in the investigation of Jones lost at trial and appealed, arguing, as the Seventh Circuit put it, "Jones failed to prove a conspiracy." *Id*. at 992. The Seventh Circuit disagreed:

> To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them. Beyond this, attempts at definition will not help.

> We cannot say that the jury acted unreasonably in finding that all of the individual defendants were voluntary participants in a common venture to railroad George Jones.

*Id*. at 992 (citations omitted). In discussing the liability of the supervisory officers, after the benefit of discovery, the court explained what Jones was required to prove at trial:

> To be held liable for conduct of their subordinates, supervisors must . . . know about the conduct and facilitate it, approve it, condone it, *or turn a blind eye for fear of what they might see*. They must in other words act either knowingly or with deliberate, reckless indifference. This heavy burden on plaintiffs is easy to understand in a case such as this case where the ground of the supervisors' liability is that they conspired with subordinates to violate the plaintiff's constitutional rights. There is no such thing as accidental or inadvertent participation in a conspiracy.

* * *

16

> The jury was entitled to find that had it not been for the misconduct of the defendants, Jones would neither have been arrested nor charged.

*Id*. at 992-93 (emphasis supplied, citations omitted).

Plaintiff's lengthy description of the notorious *Jones* case is valuable to help explain why it is inappropriate for this Court to dismiss Plaintiff's case based upon the conclusory and largely boiler-plate arguments advanced by Defendants. *See,* Dkt. 75, ¶3 (arguing that Plaintiff's claims "are patently frivolous and hinge on outrageous accusations of misconduct") and Dkt. 81, p. 1 (arguing that Plaintiff's race discrimination "theory is unhinged"). While Plaintiff does not suggest that his circumstances are just like those discussed in *Jones*, the following is true. If Mr. Jones had made these allegations in *without the help of Officer Laverty's good conscience*, his counsel would have been ridiculed in a similar manner. *See, e.g.,* Dkt. 75, suggesting that these allegations have been "conjured out of whole cloth by Plaintiff and his attorney." It is neither "frivolous", "outrageous" or "unhinged" for Plaintiff to assert that Defendants acted in concert *to make him an example* and to help justify Rodriquez's passionate conflicts with Sector Latino - which ultimately led to Sector Latino's ouster as a recognized supporters group and the cancellation of its members' season tickets. *Jones* controls the pleading standards which apply to preclude the dismissal of these claims relative to each Defendant's personal involvement.

### A.  Plaintiff Has Stated Viable False Arrest Claims (Counts I and II)

In Count I, Plaintiff has asserted a Fourth Amendment based false arrest Claim against Defendants Ortiz, Nesis and Police Officer Pell.  Count II asserts a state law claim for false arrest. Plaintiff was framed for a crime he did not commit. Probable cause did not exist to arrest Plaintiff under the facts alleged. At least five security cameras pointed towards the incident between Plaintiff and Ortiz. Given the conflicting statements between Ortiz and Plaintiff, the lack of any

visible injuries to Ortiz, and the lack of exigent circumstances, Defendant Officer Pell should have reviewed the security camera footage before footage was lost. TAC ¶¶15, 24, 27-28, 44, 133-142.

Defendants cannot defeat the TAC by protesting at this stage of the case that probable cause existed to arrest Plaintiff for battery. Defendants Pell, Ortiz and Nesis argue in a conclusory manner that "Plaintiff's claim fails because Officer Pell had probable cause to arrest Plaintiff for battery. Plaintiff alleges that Officer Pell arrested him based on the firsthand accounts of two eyewitnesses, Ortiz and Nesis. That, in and of itself, constituted probable cause for Officer Pell to arrest Plaintiff." Dkt. 75, ¶18. Pell, Ortiz and Nesis ignore Paragraphs 231 through 236 of the TAC which points out why Ortiz's statement to Officer Pell was unbelievable:

¶¶**231-32**, it would not have been plausible or reasonable for Ortiz to have seen his alleged attacker under the specific set of circumstances that he described to Officer Pell. In particular, Officer Pell should have questioned the plausibility Ortiz's claim that he was struck with a closed hand – where Ortiz specifically stated that he was struck in the back of the head. How would Ortiz know the manner in which he was struck (open vs. closed hand) and how could he have reasonably seen his assailant under these circumstances?;

¶**233**, Ortiz specifically stated that he was struck in the back of the head and that he was taken to the ground as a result of this closed fist blow. Under these circumstances, how could he have reasonably seen his assailant?;

¶**234**, Ortiz stated that he knew Plaintiff was his attacker because he saw Plaintiff running away. Officer Pell should have questioned Ortiz's identification of Plaintiff because it is not reasonable for Defendant Ortiz to have assumed that Plaintiff was his attacker where Ortiz reported to Officer Pell that a fight was in progress at the time he interacted with Plaintiff;

¶**235**, Officer Pell had a reasonable basis to question the veracity of Ortiz's report of battery because Officer Pell reported that he observed no visible injuries and that Ortiz refused medical care – despite Ortiz claiming that he was struck with a close hand on the back of his head, and that he was forcefully taken to the ground. Why bother to prosecute Plaintiff under these circumstances, unless something more illegal was in play?; and

¶**236**, Officer Pell had a reasonable basis to question the veracity of Ortiz's statement when Plaintiff appeared more earnest and credible than Ortiz where Officer Pell wrote that Plaintiff denied striking Defendant Ortiz, but admitted to flicking a cigarette at

Houston fans *and* running away from security personnel. By admitting the conduct as it was written in Officer Pell's report, Plaintiff gained credibility in Pell's eyes.

This Court has recognized that factual disputes at the pleading stage demonstrate why the existence of probable case cannot be determined in the context of a motion to dismiss. *Terry v. Talmontas*, 2013 U.S. Dist. LEXIS 28063, *19-*20 (N.D. Ill. Feb. 26, 2013) ("whether Matthew and Young provided Defendants with 'reasonably trustworthy information . . . sufficient to warrant a prudent person in believing that the suspect had committed' an offense, is a factual issue that requires discovery.") (citation omitted).[19] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) *U.S. v. Marzook*, 426 F. Supp. 2d 820, 827 (N.D. Ill. 2006) ("[Defendant's] credibility attack on individual A is not a matter appropriately resolved on a motion to dismiss. The credibility of a witness is left for the trier of fact.").[20] For these reasons, Defendants' Motion to Dismiss should be denied.

### B. Plaintiff Has Alleged Sufficient Allegations of Personal Involvement

Defendant Rodriguez urges this Court to dismiss the Complaint on the basis that there are insufficient allegations to tie Rodriguez to a conspiracy to wrongfully convict Plaintiff. Dkt. 81, pp. 3-5. The Monterrey Defendants' similarly argue that there are insufficient allegations of a conspiracy to survive a motion to dismiss. Dkt. 75, pp. 15-16. Both sets of Defendants take several

---

[19] *See also, Ajster v. Towne*, 2018 U.S. Dist. LEXIS 120269, *7-*8 (N.D. Ill. July 19, 2018)("Defendants argue that probable cause existed, but that cannot be determined based on the complaint alone, which is all the Court can properly consider at this point. Defendants' reliance on a grand jury's return of an indictment is misplaced on a Rule 12(b)(6) motion, as they concede the indictment is not conclusive if Towne did not have an honest belief in the validity of the charges. Ajster has sufficiently alleged this; she squarely alleges that Towne knew that probable cause was lacking but nonetheless caused her to be prosecuted out of personal animus due to her advocacy against him.").

[20] This court has denied *summary judgment* where an officer and a plaintiff's version of events differed dramatically – as is the case here. *Crawford v. City of Chicago*, 2014 U.S. Dist. LEXIS 57720, *8-*12 (N.D. Ill. April 25, 2014).

pages to make these arguments, which strongly suggests that sufficient facts have been alleged. Defendants' arguments ignore the fact that it is rare for a victim of false arrest to have knowledge of all of the acts of misconduct attributable to conspirators.

This Court recognized in two recent cases (at the motion to dismiss stage and at summary judgment) that defendants rarely confirm their conspiracies in concrete terms:

> "It is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with[.]"
>
> ***
>
> [T]here is no requirement, at the motion-to-dismiss stage, that a plaintiff alleging conspiracy plead any facts directly relating to an agreement. Indeed, the Seventh Circuit has explained that plaintiffs alleging conspiracy need not "plead a meeting of minds in detail," as conspiratorial agreements "may need to be inferred even after an opportunity for discovery, for conspirators rarely sign contracts."
>
> Here, Plaintiffs have satisfied the pleading requirements for conspiracy, which only require them to plead the parties involved, the general purpose, and the approximate date[.]

*Campbell v. City of Chicago*, 2018 U.S. LEXIS 155258, *13-*16 (N.D. Ill. Sept. 12, 2018) (certain legal internal citations to the operative complaint omitted); *Melongo v. Podlasek*, 2019 U.S. Dist. LEXIS 44590, *60 (N.D. Ill. March 19, 2019) ("[N]one of this evidence directly establishes the existence of a conspiracy, but '[d]irect proof . . . is rarely available since conspiracies are by their very nature secretive.' *Patrick v. City of Chi.*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016). Thus, 'the existence of a conspiracy may be inferred through the combination of common sense and circumstantial evidence.' *Id.* Altogether, the circumstantial evidence is sufficient for a jury to conclude that Defendants conspired against Melongo. As such, the request for summary judgment on this issue is denied"). *See also*, *Geinosky*, 675 F.3d at 749 ("Under *Twombly*, all plaintiff needed to allege was a plausible account of a conspiracy.").

*Geinosky* offers an apt discussion of a plausible claim of conspiracy – where as is the case

here – several defendants "acted in the same inexplicable way against a plaintiff".

> While the complaint makes only rather conclusory direct allegations of conspiracy, the complaint also alleges a pattern of harassment by several officers over a period of months. It is a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy.
>
> * * *
>
> *Iqbal* calls on us to apply our "judicial experience and common sense." If several members of the same police unit allegedly acted in the same inexplicable way against a plaintiff on many different occasions, we will not dismiss a complaint for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion.

*Geinosky*, 675 F.3d at 749 (citations omitted). Plaintiff was subjected to a continuing scheme to falsely arrest him and maliciously prosecute him after he was arrested on May 20, 2018.

As explained in *Matthews v. Hughes*, 2015 U.S. Dist. LEXIS 135139 at *5-*6, only minimal level of factual allegations need to asserted to survive a motion to dismiss. ("The operative complaint alleges a "collusive conspiracy of Local 3766 with Hughes, the Village, and the Board to circumvent the provisions of the pertinent statutes, ordinances and provisions of the Redbook and the Collective Bargaining Agreement in favor of a sham, empty, unrealized and aborted 'grievance' process [that] deprived the Plaintiff of his property right and interest in maintaining and continuing his employment." Doc. 10 at ¶ 82. Consistent with *Walker*, this allegation identifies the parties to the conspiracy (Local 3766, Hughes, the Village, and the Board), its general purpose (to deprive Matthews of any meaningful process to contest his termination), and its approximate timeline (the period surrounding his termination).")

Further complicating things if the fact that Rodriguez conducts uses a private email address to conduct sensitive matters for his employer, with the primary purpose to avoid having his emails be stored on a server maintained by the Chicago Fire.

### C. Plaintiff Has Stated Viable Claims for Race Discrimination Against Defendants Ortiz and Rodriguez (Counts III – Section 1981, IV – Section 1982 & V – Section 1985(3))

Section 1981 prohibits. Section 1982 prohibits Section 1985(3) creates a civil damages action against two or more persons who "conspire ... for the purpose of depriving" the plaintiff of "the equal protection of the laws" and who take or cause to be taken "any act in furtherance of the object of such conspiracy." 42 U.S.C. § 1985(3).

Plaintiff has alleged more than is required; having pointed to two people who were treated better than him for similar alleged conduct. The first is "D.W." who allegedly assaulted a minor and was not subject to similar discipline. Dkt. 71, ¶¶ 262, 270. The second individual who was treated more favorably is Badr Tabbaq, a Houston Dynamo fan who was the *instigator* of the post-game incident between Houston and Chicago Fire fans. TAC ¶108. Tabbaq also got into a physical altercation with one or more Monterrey Security employees and was detained by Defendant Perez. TAC ¶¶109-10. Tabbaq is not Latino or Hispanic. Unlike these two individuals, Plaintiff was banned from Toyota Park for a year until his ban was rescinded).  Plaintiff has pled more than is required under the law.  "[W]hether individuals are similarly situated is a factual question for the jury." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004).

### 1. Defendants Ortiz and Rodriguez Are Not Insulated From Liability Because They Have Hispanic Surnames

As a threshold argument, Ortiz and Rodriguez seek to dismiss Plaintiff's race-discrimination claims on the basis that they cannot discriminate against a fellow Latino. Dkt. 75, ¶¶ 1, 48-49.  This argument is contrary to well-established law.  As a matter of law, a defendant's Hispanic or Latino surname does not insulate him from being sued for heritage or national origin based discrimination. *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987)("Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.").[21]

---

[21] *See also*, *Jordan v. Whelan Sec. of Ill. Inc*., 30 F. Supp. 3d 746, 752 (N.D. Ill. 2014) (denying motion to

In *Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018) the court held that the Trump Administration's decision to end the Deferred Action for Childhood Arrivals (DACA) program was reviewable. In so concluding, it recognized that discriminatory conduct can manifest itself within sub-sets of immigrants – those of Hispanic origin. 908 F.3d at 485-87, 518-20 ("plaintiffs allege that the rescission of DACA disproportionately impacts Latinos and individuals of Mexican heritage, who account for 93% of DACA recipients. The complaints also allege a history of animus toward persons of Hispanic descent evidenced by both pre-presidential and post-presidential statements by President Trump, who is alleged to have decided to end DACA[.]") (citation omitted).

Ortiz, Nesis and Rodriguez also contend that Plaintiff has only alleged allegations of discrimination against them in a "conclusory fashion." Dkt. 75, ¶¶ 9, 43, 46. Defendants Ortiz and Nesis also allege that Plaintiff's allegations of discrimination "are simply implausible without

---

dismiss Section 1981 claim brought by light-skinned African-American who claimed that she was discriminated against by her darker-skinned supervisor, "[t]he court agrees with the courts that have held that *St. Francis* compels the conclusion that § 1981 encompasses claims of color discrimination."); *Billingsley v. Jefferson County*, 953 F.2d 1351, 1353 (11th Cir.1992) ("Jefferson County in its appeal first contends that 'there is no cause of action under Title VII 2 where both plaintiff and defendant are of same race and color.' This contention is totally without merit."); *In re Lewis*, 845 F.2d 624, at 635 (6th Cir.1988) ("The mere presence of one black person in the decision-making process cannot shield a company from liability under civil rights statutes."); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 n.5 (4th Cir. 2002) ("Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a darkcolored African-American individual is discriminated against in favor of a light-colored African-American individual."; *Flores v. Merced Irrigation Dist.*, 758 F. Supp. 2d 986, 999 Fn 9 (E.D. Cal. 2010) ("A triable issue of fact exists as to whether members of the same race may be motivated to act on impermissible racial grounds."); *PAS Communs. Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1168-69 (D. Kan. 2001) ("Defendant, however, points to no authority suggesting that [a defendant being a member of the plaintiff's protected class] precludes PAS from establishing a prima facie case."); *Cardona v. American Express Travel Related Services Co.*, 720 F. Supp. 960, 961-63 S.D. Fla. 1989) (denying motion to dismiss Columbian Plaintiff's claims of discrimination at the hands of Defendants of Cuban decent/origin); *Walker v. Secretary of Treasury, IRS*, 713 F. Supp. 403, 407-08 (N.D. Ga. 1989) ("A person's color is closely tied to his ancestry and could result in his being perceived as a 'physiognomically distinctive sub-grouping of homo sapiens,' which in turn could be the subject of discrimination."); *Franceschi v. Hyatt Corp.*, 782 F. Supp. 712, 722 (D.P.R. 1992) ("[I]ntra-racial discrimination is actionable under the statute.").

further factual support." Dkt. 75, ¶29. Defendants Ortiz and Nesis also contend that Plaintiff's claims of race discrimination "are controverted by his previous allegations that Nesis and Ortiz harbored ill will towards him due to a prior incident." Dkt. Dkt. 75, ¶48.[22]

As to Rodriguez, Sector Latino had long been a point of consternation for Rodriguez (who is allegedly of Argentinian decent[23]). As a self-identified "Latino", Rodriguez's Motion to Dismiss ignores a rather sinister aspect of Argentine culture which plausibly has impacted his handling of Plaintiff's false arrest and his response to Plaintiff's plight. It is well-documented that Argentinian's of European ancestry have a history of discrimination against indigenous peoples.[24]

---

[22] "[S]imply presenting an alternative explanation for the facts alleged in the complaint is insufficient to demonstrate that the complaint fails to plausibly suggest a right to relief." *Izsak v. Draftkings, Inc.*, 191 F.Supp.3d 900, 905 (N.D. Ill. 2016).

[23] See footnote 3.

[24] A May 2016 report from the United Nations' Office of the High Commissioner, "urged the Government of Argentina to take urgent measures to sustainably address the invisibility, marginalization and systematic exclusion of indigenous peoples, one of the most vulnerable group in the country." https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=20008&LangID=E According to a United Nations' report, historical discrimination towards indigenous peoples of Argentina is rooted in the fact that Argentina was primarily "founded" by the "overflow" of Europeans from "neighboring Spanish colonies." https://www.refworld.org/docid/593942d54.html *Report of the Special Rapporteur on contemporary forms of racism, racial discrimination, xenophobia and related intolerance on his mission to Argentina*, p. 3, ¶5 The report states that European settlers in Argentina discriminated against indigenous peoples by "fram[ing]" them "as being in a stage of very primitive 'evolution', a perception in line with the racist ideology of that time. They were viewed as outsiders to the country's aspiration to build a 'model European civilized society'." *Id*. ¶6. The report details how a "Eurocentric" point of view has dominated Argentinian culture and has fostered discrimination towards indigenous peoples. *Id*. ¶7. Caucasian-European racism in Argentina has a history of government participation. Argentina's 1994 Constitution incorporated Article 25 of the National Constitution of 1853 which provides as follows: "The Federal Government will encourage European immigration; and will not restrict, limit, nor tax the entry of any foreigner into the territory of Argentina who comes with the goal of working the land, bettering industry, or introducing or teaching sciences or the arts." Juan B. Alberdi, Article 25's sponsor and the father of the Argentine Constitution of 1853, explained why it was necessary to promote Caucasian-European immigration:

"If we want to see our States enlarged in a short time, let us bring their already trained and prepared elements from the outside"; and

"If you were to put the *roto*, the *gaucho*, the *cholo*, the basic element of our popular masses, through the finest educational system; in one hundred years you would not make him an English worker who works, consumes, and lives comfortably and in a dignified manner."

24

Therefore, given Rodriguez's public comments, is plausible to suggest that Rodriguez's image of the ideal Chicago Fire Soccer fan mirrors a Eurocentric rather than Latino model. Plaintiff has plausibly alleged Rodriguez did not approve of the boisterous manner in which Sector Latino supported the Chicago Fire at home and away matches. TAC ¶256. In particular, Rodriguez viewed members of Sector Latino and Plaintiff as uncouth troublemakers. *Id*. Plaintiff's counsel has learned that during behind-closed door and taped closed-door meetings with other leaders of Section 8 and other fans of Chicago Fire, Rodriguez referred to Sector Latino as "operating like a gang" and/or "gang-like". These meetings were tape-recorded. Rodriguez knew that his comments about Sector Latino were highly charged and discriminatory in nature because he told people who attended the closed-door meetings that he would not make his comments in a public forum. Rodriguez caused and/or allowed Plaintiff to be prosecuted to teach Plaintiff and others like him a lesson and to help Rodriguez orchestrate the ouster of Section Latino from the confines of Toyota Park. TAC ¶¶163-73, 275-76, 278, 288. Rodriguez's disapproval of Sector Latino's boisterous and "gang-like" manner of support have its roots in well-recognized aspect of Argentine culture – self-professed sophistication, pride and arrogance.[25]

---

http://www.cervantesvirtual.com/obra-visor/bases-y-puntos-de-partida-para-la-organizacion-politica-de-la-republica-argentina--0/html/ff3a8800-82b1-11df-acc7-002185ce6064_10.html#I_22_ Chapter 15, pp. 90-91 (as translated). It is necessary to point to these examples where Rodriguez appears to ignore Argentina's long-reported history of Eurocentric racism towards indigenous peoples. Constituent with the allegations of the TAC, while Rodriguez prides himself on his Latino heritage, his view of how Latinos should act manifests himself in his dislike for the manner in which Sector Latino supports portray themselves – which is as working class types, akin to indigenous peoples.

[25] As explained by New York Times author Calvin Sims, Argentines are derided by their South American counter-parts:

Argentines have long taken pride in their arrogance, perhaps as a way of covering over their own insecurities about their real identity. They flaunt their European ancestry and culture to their Latin American peers, who have mixed or indigenous blood. Now recent social and economic reforms suggest that the Argentine reputation for haughtiness may no longer be deserved. The view was perhaps rooted in a misunderstanding of a people who have historically vacillated between grand sophistication and banality.

### 2. Depriving Plaintiff of this Contractual Rights to Enter the Confines of Toyota Park Constitutes a Prima Facie Violation of Section 1981

Plaintiff has stated a viable claim for racial discrimination in violation of Section 1981 where he was denied access to Toyota Park without cause. *See*, *Hammad v. Dynamo Stadium, LLC*, et al., 4:14-cv-01938 (S.D. Tex. Dec. 5, 2014) (Dkt. 20, Memorandum and Order denying motion to dismiss) (attached as Exhibit B) and Complaint (Dkt. 1) (attached as Exhibit C).

### 3. The Conduct of Ortiz, Nesis and Rodriguez Deprived Plaintiff of this Contractual Rights to Enter the Confines of Toyota Park

Defendants Ortiz and Nesis seek to dismiss Counts III and IV on the basis that Defendant Nelson's conduct unlawfully deprived Plaintiff of his right to access Toyota Park after Defendant Nelson authorized Plaintiff's one-year ban from Toyota Park. This argument misses the mark because Ortiz and Nesis essentially set the ban into motion by causing Plaintiff to be falsely arrested in the first instance. Rodriguez approved the 12th month ban at Toyota Park which automatically resulted in a 12 month ban across all MLS stadiums in the United States and Canada.

### 4. Plaintiff Has Alleged that Defendants Ortiz, Nesis and Rodriguez Acted with Sufficient Discriminatory Animus

Plaintiff has alleged enough plausible allegations to state claims of discrimination pursuant to Sections 1981, 1982 and 1985(3). Plaintiff has pointed to two similarly situated persons who are not Hispanic who were treated favorably for similar or worse alleged conduct. "D.W." is a Caucasian who allegedly assaulted a minor and was not subject to similar discipline. Dkt. 71, ¶¶ 262, 270. The second individual who was treated more favorably is Badr Tabbaq, a Houston fan

---

\* \* \*

For much of their history, Argentines have thought of themselves as a European outpost because so few of them have mixed blood. They built their country in the style of the homelands of ancestors who emigrated from Europe at the turn of the century.
https://www.nytimes.com/1998/05/24/weekinreview/the-world-formerly-arrogant-utterly-argentine.html

who was the "instigator" of the post-game incident. Tabbaq is not Latino or Hispanic. Unlike these two non-Hispanic individuals, Plaintiff was banned from Toyota Park for a year (and all MLS stadiums in Canada and the United States) until his criminal charge was *nolle prossed*. Plaintiff has pled more than is required under the law.

### 5. Plaintiff Has Alleged that Defendants Ortiz, Nesis and Rodriguez Acted with Sufficient Discriminatory Animus

Consistent with *Jones v. City of Chicago*, Plaintiff has properly asserted a claim for discrimination pursuant to Section 1985(3). "[A] complaint under § 1985(3) must allege a conspiracy motivated by a racial or other class-based animus." *Kyle v. Morton High Sch.*, 144 F.3d 448, 457 (7th Cir. 1998); *see also Westbrook v. Barclay Court Reporters*, 591 F. App'x 514, 514 (7th Cir. 2015); *Matthews v. Hughes*, 2015 U.S. Dist. LEXIS 135139 at *5-*6 ("[T]he operative complaint pleads facts suggesting that the alleged conspirators' conduct was racially motivated."); *Maglaya v. Kumiga*, 2015 U.S. Dist. LEXIS 101217, 2015 WL 4624884, at *12-13 (N.D. Ill. Aug. 3, 2015) (denying dismissal of a § 1985(3) claim where the plaintiff alleged the conspiracy's parties, general purpose, and time frame, and also that the conspirators acted with the purpose of denying the plaintiff equal protection). Plaintiff has pled sufficient facts to allow this court to infer a plausible claim for discrimination and discriminatory treatment.

### D. Plaintiff Has Asserted a Viable "Class of One" Claim (Count VII)

A class-of-one equal protection claim may be brought where (1) the plaintiff alleges that he has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment or the cause of the differential treatment is a "totally illegitimate animus" toward the plaintiff by the defendant. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Plaintiff has asserted a viable class-of-one claim versus Defendants Ortiz, Nesis and Thompson. A plaintiff "must allege that he was 'intentionally treated differently from others

similarly situated and that there is no rational basis for the difference in treatment.'" *Geinosky*, 675 F.3d at 747. "We have held that class-of-one claims can be brought based on allegations of the irrational or malicious application of law enforcement powers." *Id. Geinosky* explains what is required to allege class-of-one claim. The plaintiff in *Geinosky* alleged that a police officer harbored an idiosyncratic animus against him that resulted in the officer unjustifiably issuing numerous parking tickets for the purpose of harassment. While the Seventh Circuit recognized that excessive ticketing *could be rational and proper*, the conduct was found to be to unconstitutional, because there is no *legitimate* reason for the officer to single out the plaintiff for poor treatment.

Here, Plaintiff has alleged that Defendants Ortiz, Nesis and Thompson trumped up charges against him in response to animosity that they harbored against him from an incident that took place at Toyota Park at a "meet the team" event during the prior season. Additionally, Plaintiff has alleged more than is required. As noted above, Plaintiff has pointed to two non-Hispanic persons who were treated better than him for similar alleged conduct: "D.W." who allegedly assaulted a minor and was not subject to similar discipline (Dkt. 71, ¶¶ 262, 270); and Badr Tabbaq, a Houston Dynamo fan who was the instigator of the post-game incident which took place on the same day Plaintiff was falsely arrested and assaulted (*Id*. 105-111). Whether these two individuals are substantially similar to Plaintiff is an issue for summary judgment. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004). Plaintiff need not allege more at this stage.

### E. Plaintiff Has Asserted a Failure to Intervene Claim Versus Defendants Rodriguez, Bubacz, Nesis and LeFevour Pursuant to § 1986 (Count VI)

This Court has held that a plaintiff may assert a "failure to intervene" claim by pleading that the law enforcement officer "(1) had reason to know that a fellow officer was . . . committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Campbell*, 2018 U.S. LEXIS 155258 *16. Rodriquez claims to have the ability to

control and influence the actions of Monterrey Security. Rodriguez discussed his powers during pre-game speech to Chicago fans where he stated that if fans were observed uttering an "inappropriate and offensive chant", they would be "subject to removal." Rodriquez also advised fans observing the chant to "advise stadium security so we can handle them as well."[26] While Rodriguez takes great offense to the allegations against him, he was never asked improperly influence the assigned Assistant State's Attorney as he argues. Dkt. 81, p. 2. To be perfectly clear, Rodriguez should have reached out to Monterrey Security, Defendant Ortiz's employer to ask why Ortiz was continuing to accuse Plaintiff of battering him when cellphone video and security camera footage demonstrated that Plaintiff did not batter Ortiz. TAC ¶159. Rodriguez's argument obfuscates well-established law – that private citizens may violate the Constitution or commit the tort of malicious prosecution if they cause charges to be brought or continued against an innocent person. *Snodderly*, 239 F.3d at 902; *Reed*, 77 F.3d at 1053-54. And LeFevour, along with Bubacz and Nesis, failed to step in an stop Ortiz from violating Plaintiff's civil rights. As a lawyers, LeFevour had an obligation to not suborn perjury and should not have condoned and facilitated Ortiz's lies in the face of cellphone videos.

### F. Plaintiff Has Stated a Claim for Malicious Prosecution (Count XIII)

As this Court has recognized, "[a] private individual may be held liable if she "initiated a criminal proceeding or [her] participation in it [was] of so active and positive a character as to amount to advice and cooperation." *Melongo v. Podlasek*, 2019 U.S. Dist. LEXIS 44590, *57-*58 (N.D. Ill. March 19, 2019) (quoting *Denton v. Allstate Ins. Co.*, 152 Ill. App. 3d 578, 504 N.E.2d 756, 760, 105 Ill. Dec. 471 (Ill. App. Ct. 1986). Ortiz committed the tort of malicious prosecution by initiating the charges against Plaintiff as a complaining witnesses. LeFevour and Nesis

---

[26] See, https://www.chicagotribune.com/news/columnists/kass/ct-chicago-fire-anti-gay-soccer-chant-kass-0804-20160803-column.html

committed the tort of malicious prosecution by attempting to vouch for Defendant Ortiz's false charge, and the false charge was *nolle prossed* on December 19, 2018, the day Plaintiff's trial was supposed to start. TAC¶¶196-212, 335-42. LeFevour asked the assigned Assistance State's Attorney - "why would you take the word [of Plaintiff] over the words of two decorated law enforcement officers?" ¶340. LeFevour's question was not a mere comment, it was an active attempt to influence the continued unlawful prosecution of Plaintiff despite her knowing that both Defendants Ortiz and Nesis were willing to lie to convict Plaintiff. ¶341. LeFevour and Nesis's conduct in unlawfully continuing the prosecution of Plaintiff constitutes a malicious prosecution because they attempted to wrongfully influence plaintiff's prosecution after the charges were levied by Ortiz without a superseding indictment. *Snodderly*, 239 F.3d at 902; *Reed*, 77 F.3d at 1053-54; *Jones*, 856 F.2d at 993-94; *Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018) (deprivation of liberty based on manufactured evidence, including false police reports).

### G. Intentional Infliction of Emotional Distress ("IIED") – Count XIV

This court has denied summary judgment on an IIED claim where a defendant withheld a document which had the power to free an innocent man, holding that this conduct had a high probability of inducing the wrongfully convicted plaintiff to suffer severe emotional distress. *Chatman v. City of Chicago*, 2018 U.S. Dist. LEXIS 5496, *59 (N.D. Ill. 2018). Plaintiff never had a run-in with the law until he was falsely arrested by Defendant Ortiz. As a young man (Plaintiff is now in his early 20s), the specter of a wrongful conviction and losing his job as a result of a conviction, caused Plaintiff to suffer severe emotional distress.

The Motions to Dismiss should be denied because misconduct and bad acts committed go well beyond mere "trivialities." Dkt. 75, ¶74.

**Wherefore**, the Monterrey Defendants' Motion to Dismiss (Dkt.74) and Defendant Rodriguez's Motion to Dismiss (Dkt. 80) should be denied.

*/s/ James C. Vlahakis*
Sulaiman Law Group, Ltd.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
(630) 581-5456
(630) 575-8188 (fax)
jvlahakis@sulaimanlaw.com

### Certificate of Service

I certify that I filed the above document with the Clerk of the Court on July 10, 2019, and that the ECF system maintained by the Clerk will automatically transmit this filing to all counsel of record.

*/s/ James C. Vlahakis*
Sulaiman Law Group, Ltd.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
(630) 581-5456
(630) 575-8188 (fax)
jvlahakis@sulaimanlaw.com