UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABRAHAM CALDERON, | ) |
|     Plaintiff, | ) |
| | )    Case No. 18 cv 08277 |
| v. | ) |
| | )    Judge John Z. Lee |
| VILLAGE OF BRIDGEVIEW, ILLINOIS, et al. | ) |
|     Defendants. | ) |

**REPLY IN SUPPORT OF NELSON RODRÍGUEZ'S MOTION TO DISMISS**

**I. INTRODUCTION**

Plaintiff's Response further confirms that this Court should end this vexatious litigation against Mr. Rodríguez. Instead of distinguishing the cases that Mr. Rodríguez cited, Plaintiff ignores them. Instead of explaining why Plaintiff's cited cases support his argument, he miscasts the standards for pleading his claims. Instead of squarely addressing Mr. Rodríguez's arguments, Plaintiff attacks straw men.[1] Most remarkably, instead of arguing from well-pleaded facts to support his allegations of racism, Plaintiff sadly relies on stereotypes to argue that "a rather sinister aspect of Argentine culture . . . plausibly impacted [Mr. Rodríguez's] handling of Plaintiff's false arrest and his response to Plaintiff's plight." (Resp. at 24)

Plaintiff also ignores many of Mr. Rodríguez's arguments for dismissal, including:

- Penalizing a supporters group for race-neutral reasons (*e.g.*, the members' use of a homophobic chant and the group's failure to turn in members who committed acts endangering the safety of other fans) does not suggest any discriminatory intent. (Doc. 81 at 7)

---

[1] Plaintiff repeatedly mischaracterizes Mr. Rodríguez's motion to dismiss. For example, Mr. Rodríguez never argued for the dismissal of the Third Amended Complaint because (i) he "cannot discriminate against a fellow Latino" (Resp. at 22), (ii) he "did not know about Plaintiff's arrest and prosecution"(*id.* at 9 n.11, 7), (iii) he is "powerless to impact how fans are subject to ejection and stadium bans" (*id.* at 10), or (iv) he "was not present at Toyota Park on May 20, 2018" (*id.* at 11).

- On the face of the Third Amended Complaint ("TAC"), the individuals identified as "DW" and "Badr Tabbaq" were not similarly situated to Plaintiff so they do not support a plausible claim of discriminatory intent or racial animus. (*Id.* at 8)
- There are no well-pleaded facts supporting a plausible claim that Mr. Rodríguez took even a single step in furtherance of a conspiracy. (*Id.* at 12)
- As a matter of law, a claim for intentional infliction of emotional distress cannot be sustained for an alleged failure to provide evidence to a prosecutor. (*Id.* at 15)[2]

Plaintiff justifies his non-responsiveness by claiming that Defendants' motions to dismiss were an "effort to preview their summary judgment defenses" that contained "inapposite cases and cases decided at the summary judgment stage." (Resp. at 5-6) In fact, Mr. Rodríguez's motion cited many cases dismissing similar claims.[3] Yet Plaintiff does not even *mention* any of those cases, let alone explain to this Court why they do not support dismissal.

After more than a thousand paragraphs of allegations over four complaints and now thirty pages of briefing, Plaintiff still cannot articulate a set of facts supporting any cause of action upon which relief can be granted with respect to Mr. Rodríguez. Accordingly, this Court should dismiss with prejudice the TAC's claims against Mr. Rodríguez.

**II.     ARGUMENT**

    **A.     The §§ 1981, 1982, and 1985(3) claims fail because Plaintiff has not pleaded facts sufficient to sustain a plausible claim of discriminatory intent or animus.**

Plaintiff's Response highlights the inadequacy of his discriminatory intent and racial animus claims with respect to Mr. Rodríguez. In a shocking passage, Plaintiff questions Mr. Rodríguez's ethnicity while desperately attempting to give the claims a facade of plausibility:

> As a self-identified 'Latino', Rodríguez's Motion to Dismiss ignores a rather sinister aspect of Argentine culture which plausibly has impacted his handling of Plaintiff's false arrest

---

[2] The wholesale lack of engagement with the motion to dismiss provides another ground to dismiss the TAC with prejudice. *Lee v. Ne. Illinois Reg'l Commuter R.R. Corp.*, 912 F.3d 1049, 1052 (7th Cir. 2019).

[3] In over 90% of the cases cited in Mr. Rodríguez's motion to dismiss the court either affirmed or granted a motion to dismiss. Attached as Exhibit A is a Table of Authorities for the motion to dismiss. The cases granting or affirming a motion to dismiss are bolded.

2

>and his response to Plaintiff's plight. It is well-documented that Argentinian's [sic] of European ancestry have a history of discrimination against indigenous peoples . . . Rodríguez's disapproval of Sector Latino's boisterous and 'gang-like' manner of support have [sic] its root in [sic] well-recognized aspect of Argentine culture – self-professed sophistication, pride, and arrogance.

(Resp. at 24-25) In other words, Plaintiff bases his claim that Mr. Rodríguez hates other Hispanics enough to railroad an innocent man on blatant stereotypes. Plaintiff spends two pages espousing these stereotypes of Argentinians and then imputing those stereotypes to Mr. Rodríguez because he is of Argentinian descent. (*Id.* at 24-25; *id.* at 24 n.24; *id.* at 25 n.25) Plaintiff cites a UN report, Argentina's constitution, and a more than 100-year-old quote from an Argentinian politician. (*Id.* at 24 n.24) But nothing connects Mr. Rodríguez to this theory other than his family's national origin, unwarranted inferences, baseless conclusions, and offensive stereotyping.

Plaintiff agrees that "[a] common sense analysis should apply" in judging his claims. (*Id.* at 5) However, Plaintiff's claim that Mr. Rodríguez conspired "to railroad Plaintiff for a crime he did not commit" to "strike fear in the heart of members" of a supporters group he disliked and to "help justify Rodríguez's actions in disbanding" that supporters group defies common sense. (*Id.* at 3, 8) As an initial matter, the Fire, not Mr. Rodríguez the individual, enacted the discipline. Regardless, as set forth below, there was no need for a pretext to discipline a supporters group for violating the Fan Code of Conduct.

Even accepting Plaintiff's allegations as true for the purposes of this motion, the purported reasons for the suspension of Sector Latino offered in the TAC and Response are all race-neutral: (i) its members "engag[ing] in a chant that Rodríguez appears to find to be homophobic," (ii) its members' "passionate and aggressive 'barra brava' style of supporting the Chicago Fire," and (iii) its members' "fail[ure] to turn themselves in for their roles in the Post-Game Incident." (*Id.* at 7-

3

8) Plaintiff cannot be permitted to sustain an allegation of discriminatory intent based on these race-neutral reasons.

Moreover, Plaintiff's restatement of his allegations about two non-Hispanic fans who were allegedly treated differently than he was misses the mark. Plaintiff does not address the argument that those individuals were not similarly situated for a variety of reasons. *See LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 942–43 (7th Cir. 2010) (holding that "dismissal [of an equal protection claim] at the pleading stage was appropriate because [plaintiff] failed to allege facts tending to show that it was similarly situated to any of the comparators" described in the complaint). Neither of the referenced individuals was similarly situated because for them, unlike Plaintiff, no alleged victim complained to law enforcement, no law enforcement officer found probable cause for an arrest, and no prosecutor brought any charges. (TAC ¶¶ 103, 111, 190, 262) And Plaintiff admits that it was the arrest that "essentially set the ban into motion." (Resp. at 26)

In addition, the tweets that Plaintiff claims show that Mr. Rodríguez knew of a similarly situated individual, D.W., but chose not to rescind his ticket privileges show the opposite.[4] The tweets matched to the TAC are attached as Exhibit B. The TAC claims that D.W. "allegedly spit at a minor." (TAC ¶ 263) Tweets that Plaintiff references, however, show the alleged victim stating that D.W. "did not spit on me." (*Compare* Ex. B at 1 ¶ 2, *with* TAC ¶ 263) To support the claim that Mr. Rodríguez knew about an assault of another minor in 2018, Plaintiff cites tweets from 2018 alleging that D.W. unintentionally knocked over a little girl "a few years back" and stating

---

[4] While Plaintiff did not attach the tweets as an exhibit, he both refers to and quotes the tweets in the TAC and Response. (TAC ¶¶ 263-69; Resp. at 12) This Court may look to "[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to the claim." *Steigmann v. Democratic Party of Illinois*, 406 F. Supp. 2d 975, 986 (N.D. Ill. 2005) (internal citation and quotation omitted); *id.* ("The Seventh Circuit has considered documents central to a plaintiff's claim if the plaintiff repeatedly quotes from the documents.").

"I did not report [D.W.]." (*Compare* Ex. B at 3-4 ¶¶ 7-8, *with* TAC ¶ 264) Thus, the tweets Plaintiff cites suggest that the conduct Plaintiff alleges (i) did not occur as alleged, (ii) occurred years before Plaintiff claimed, and even then (iii) was not reported, let alone charged. Regardless, an argument between fans on Twitter is not the same as Cook County charging someone for a crime in the parking lot of the stadium.

Even more fundamentally, Plaintiff offers no facts that the Fire (not Mr. Rodríguez) decided not to pursue disciplinary action against D.W. or Tabbaq because Mr. Rodríguez only wanted to punish Hispanics. In regards to D.W., Plaintiff concludes that the Fire, presumably through Mr. Rodríguez in his official capacity, "declined to have D.W. banned . . . in part because D.W. composes tweets that are favorable to one of the owners of the Chicago Fire and D.W. is Caucasian and not a member of Section [sic] Latino." (TAC ¶267) With respect to Badr Tabbaq, Plaintiff concludes that the Fire, presumably through Mr. Rodríguez in his official capacity, "did not issue a 12 month stadium ban upon Mr. Tabbaq because Tabbaq was not a member of Sector Latino and *was not perceived as being Hispanic.*" (*Id*. ¶ 260 (emphasis added)) Plaintiff fails to offer a single fact to support his conclusions that the Fire because of Mr. Rodríguez would not punish non-Hispanics.

For the first time in his Response, Plaintiff, without citation to the TAC, asserts that Mr. Rodríguez has "referred to Sector Latino as 'operating like a gang' and/or 'gang-like." (Resp. at 25) "Gang" is referenced three times, none with respect to Mr. Rodríguez. (TAC ¶¶ 176, 257, 287) Rather, the TAC seemed to attribute any use of "gang like" to Ortiz and Nesis. (*Id.* ¶ 257 ("Defendants Ortiz and Nesis . . . viewed Plaintiff and his fellow Hispanic members of Section [sic] Latino as 'gang like' troublemakers."); *id.* ¶ 287 (same)) Further, Plaintiff's claim that Mr. Rodríguez's supposed "disapproval of Sector Latino's boisterous and 'gang-like' manner of

5

support have [sic] its roots in [a] well-recognized aspect of Argentine culture" (Resp. at 25) cannot be squared with Plaintiff's description of that very manner of support as "originat[ing] in Argentina." (TAC ¶ 176; Resp. at 3 n.1) Finally, Plaintiff offers no support for the phrase "gang-like" as a basis to infer discriminatory intent with respect to Plaintiff's arrest and temporary ticket suspension. In fact, Mr. Rodríguez is alleged to have made those supposedly "highly charged and discriminatory" statements in a *tape-recorded meeting with the association aligned with Sector Latino*. (Resp. at 25) Plaintiff pleads no facts that show or even infer that Mr. Rodríguez has uttered any racial epithet about anyone.

Plaintiff's Response cites no cases that show similarly speculative allegations of racist intent surviving a motion to dismiss. Instead, he cites *Matthews v. Hughes*, No. 14 C 7582, 2015 WL 5876567 (N.D. Ill. Oct. 5, 2015), a case in which the defendant "regularly direct[ed] racial slurs at African-American firefighters, including [plaintiff]" and "question[ed] their qualifications." *Id.* at *1. After the defendant in that case was appointed chief, he immediately fired two African-American firefighters even though an independent arbitrator had ruled they were qualified. *Matthews*, 2015 WL 5876567, at *1; First Amended Complaint ("*Matthews* Compl.") ¶ 20, *Matthews*, 2015 WL 5876567, Doc. 10.

In *Maglaya v. Kumiga*, No. 14-CV-3619, 2015 WL 4624884 (N.D. Ill. Aug. 3, 2015), another case Plaintiff cites, the defendant police officer shot his Hispanic neighbor's puppy eight times while the family's five-year-old daughter looked on from a few feet away. *Id.* at *1. The defendant allegedly referred to plaintiff and his dog using unspeakably hateful racist terms. *Id.* at *2. Another defendant allegedly said "that he [and two other defendants] had agreed that [plaintiff]

6

and her family . . . should not be in the neighborhood because of their race and Section 8 Housing status." *Id.*[5] This case bears no resemblance to those cited by Plaintiff.

Plaintiff's other cases are directed at arguments Mr. Rodríguez never made: "As a threshold argument, . . . Rodríguez seek[s] to dismiss Plaintiff's race-discrimination claims on the basis that [he] cannot discriminate against a fellow Latino." (Resp. at 22; *id.* at 22-23 n.21) On the contrary, Mr. Rodríguez pointed out that he was Hispanic not because it somehow forecloses any possibility of a racial discrimination claim, but merely to highlight one of many implausibilities of this case that require its dismissal under *Twombly* and *Iqbal*. *See Fletcher v. Philip Morris USA Inc.*, No. CIV.A.3:09CV284HEH, 2009 WL 2067807, at *7 (E.D. Va. July 14, 2009) (dismissing a § 1981 claim) ("Indeed, it would be difficult for a reasonable person to conclude that the factual allegations in the Amended Complaint even give rise to the suggestion of discrimination. To the contrary, the Amended Complaint suggests exactly the opposite. All three decision-makers involved in [plaintiff's] low-performance ratings and termination . . . are members of the same race as [plaintiff], and one . . . was also male.").[6]

---

[5] Plaintiff also cites a slip opinion that denies a motion to dismiss without any reasoning apart from a recitation of the pleading standard. *Hammad v. Dynamo Stadium, LLC,* 4:14-cv-01938 (S.D. Tex. Dec. 5, 2014). In fact, plaintiff in that case dismissed her Fourth Amendment § 1983 claim and the § 1985(3) claim in its entirety with prejudice as to all defendants, *Hammad*, 4:14-cv-01938, Doc. 67 (Oct. 9, 2015), before losing the remaining on summary judgment. *Hammad v. Dynamo Stadium, LLC*, No. CIV.A. H-14-1938, 2015 WL 6965215, at *17 (S.D. Tex. Nov. 10, 2015).

[6] Plaintiff's remaining cases do not help his argument either. He cites *Kyle v. Morton High Sch.*, 144 F.3d 448 (7th Cir. 1998) and *Westbrook v. Barclay Court Reporters*, 591 F. App'x 514 (7th Cir. 2015) in which the Seventh Circuit actually *affirmed dismissal*. He cites *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004) for the proposition that, "[a]s a general rule, whether individuals are similarly situated is a factual question for the jury." However, this issue can and should be resolved on a motion to dismiss where, as here, the fact allegations so clearly fail. *See LaBella Winnetka, Inc.*, 628 F.3d at 942-43 (2010) (affirming dismissal because comparators were not similarly situated).

> **B.** **The § 1985(3) claim also fails because Plaintiff's allegations cannot support an inference that Mr. Rodríguez agreed to violate Plaintiff's civil rights.**

Plaintiff argues that conspiracies are by their nature secretive so his bare-bones pleading is enough. (Resp. at 20) But "[a] complaint alleging a 'vast, encompassing conspiracy . . . must meet a high standard of plausibility.'" *Wrice v. Burge*, 187 F. Supp. 3d 939, 954–55 (N.D. Ill. 2015) (quoting *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009)). Plaintiff has not plausibly "demonstrated the existence of any joint action, concerted effort, or even a general understanding between" the alleged conspirators. *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998). Nor has he even "alleged anything to suggest that the members of the purported conspiracy were aware of the existence of [the] plan." *Linda Constr. Inc. v. City of Chicago*, No. 15 C 8714, 2016 WL 4429893, at *3 (N.D. Ill. Aug. 22, 2016) (dismissing §§ 1981, 1983, and 1985(3) claims and stating that a plaintiff "must plead specific material facts that show the existence of the agreement"). "In fact, the pleadings offer very little to suggest that the various Defendants were even aware of, or associated with, one another, let alone that a meeting of the minds occurred." *Id.*

Even in a case that did not allege a vast, encompassing conspiracy(ies)[7] like Plaintiff does here, this Court dismissed an otherwise similar § 1985 claim for a failure to plausibly plead a conspiracy. *Houston v. AIMCO*, No. 18 C 2635, 2019 WL 1077125, at *1 (N.D. Ill. Mar. 7, 2019). As in *Houston*, Plaintiff's "allegations are insufficient to support an inference that [defendant] entered into an express or implied agreement to violate [plaintiff's] civil rights." *Id.* at *5.

The cases Plaintiff cites in support of his § 1985(3) claim are inapposite. Unlike here, every case that Plaintiff cites had circumstantial markers of plausibility. In *Matthews*, one alleged conspirator—the racial-slur-spewing chief described above—"complained to [plaintiff] about

---

[7] As discussed in detail in the Motion to Dismiss, it is unclear if Plaintiff is alleging one conspiracy or many. Doc. 81 at 10-12.

8

various aspects of [plaintiff's] fire department uniform" because plaintiff did not buy his uniform from the "company owned and operated" by the president of plaintiff's union, another named conspirator. *Matthews* Complaint ¶ 23. Soon thereafter, the chief accused plaintiff of theft. *Id.* ¶ 24. Although "officers found that the charge was completely unfounded," *id.* ¶ 25, the chief continued to press for plaintiff's termination. *Id.* ¶¶ 28-30. All the while, plaintiff's union refused to represent him despite Illinois and local law, internal policy, and labor contracts mandating the union represent plaintiff. *Id.* ¶¶ 29, 38-44.

The facts of *Maglaya*—the case that Plaintiff cites in which the defendant shot his Hispanic neighbor's puppy—too show why a conspiracy was plausible, because the police officers repeatedly violated internal procedures for the benefit of the other alleged conspirator:

> Following the shooting, several unidentified members of the Chicago Police Department arrived on the scene. They ticketed [plaintiff's] husband for having [the dog] off-leash and not having dog tags; this ticketing was apparently incorrect as [plaintiff], and not her husband, was [the dog's] owner. […] [T]he officers allegedly did nothing to record the scene and did not file a report concerning [defendant's] discharge of his weapon. When [plaintiff] later went to . . . file a complaint, officers refused to take her statement.

2015 WL 4624884, at *1.

The same goes for Plaintiff's remaining cases. The conspiracy allegations were plausible in *Campbell v. City of Chicago*, No. 17 C 4467, 2018 WL 4352614 (N.D. Ill. Sept. 12, 2018) because there was a pattern of wrongful arrests and defendants had "an extensive history of misconduct accusations." *Id.* at *4. *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033 (N.D. Ill. 2016) involved eight people separately and falsely stating they witnessed an impossible event. *Id.* at 1058. *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012) was about officers from the same unit inexplicably issuing 24 illegitimate and inconsistent tickets to a single plaintiff in just over a year. *Id.* at 745. The court found it "a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy." *Id.* at 749. Plaintiff argues that this

9

case is like *Geinosky* because defendants here supposedly "acted in the same inexplicable way against a plaintiff." (Resp. at 21) But Plaintiff alleges no actions taken by Mr. Rodríguez that are inexplicable absent a conspiracy. Moreover, Plaintiff's own TAC describes non-racist and non-conspiratorial reasons why the other Defendants supposedly acted the way they did. (TAC ¶ 16 ("In part, Defendants Ortiz and Nesis sought to convict Plaintiff for a crime that he did not commit because they harbor animosity and ill will toward Plaintiff based upon an incident . . . during the course of [sic] 'meet the team' autograph event on or September 9, 2017."); *id.* ¶ 211 ("Simply stated, Defendant LeFevour…appeared in court…to ensure that Plaintiff would be wrongfully convicted to help diminish any civil suit that Plaintiff would file against Defendants Monterrey, Ortiz, Nesis and Perez."); *id.* ¶ 21("Defendant Ortiz told Defendant Officer Pell that he was employed in law enforcement so that Officer Pell would not question the veracity of his claims."); *id.* ¶ 94 ("On information and belief, Defendant Officer Pell agreed to take the word of Defendants Ortiz and Nesis based upon their association with law enforcement.")) Plaintiff's "conclusory and speculative allegation that it was apparent to him that [Mr. Rodríguez] joined the massive conspiracy is simply not enough." *Naguib v. Illinois Dep't of Prof'l Regulation*, 986 F. Supp. 1082, 1096–97 (N.D. Ill. 1997).[8]

### C. The § 1986 claim fails because Plaintiff does not plausibly allege that Mr. Rodríguez knew of imminent wrongs or had power to prevent those wrongs.

Section 1986 requires (i) knowledge that a conspiracy to violate constitutional rights will be committed, (ii) the power to prevent or aid in preventing the wrongs, and (ii) failure to do so

---

[8] Plaintiff's § 1985(3) theory is hard to decipher in the TAC. But to the extent he is alleging conspiracies to violate constitutional rights that require a showing of state action—like the Fourth or Fourteenth Amendment—the Court can also dismiss the § 1985(3) claim against Mr. Rodríguez because Plaintiff has not plausibly alleged state action. *See Howard v. Bd. of Educ. of Sycamore Cmty. Unit Sch. Dist. No. 427*, 876 F. Supp. 959, 967–68 (N.D. Ill. 1995).

10

(iv) resulting in the wrongful acts being committed (v) even though the wrongful acts could have been prevented by reasonable diligence. *Katz-Crank v. Haskett*, No. 1:13-cv-159, 2014 WL 1324283, at *9 (S.D. Ind. Mar. 31, 2014), *aff'd*, 843 F.3d 641 (7th Cir. 2016). Plaintiff's claim fails on at least two of the requirements, both independently warranting dismissal.

First, Plaintiff does not plausibly allege that Mr. Rodríguez knew of a conspiracy or any imminent constitutional wrongs. There are only conclusions, but no facts suggesting how Mr. Rodríguez learned of any conspiracy, its basis in racial discrimination, or the wrong intended by any coconspirators. *See Hampton v. City of Chicago*, 484 F.2d 602, 613 (7th Cir. 1973) (affirming dismissal of § 1986 claim for failing to allege facts demonstrating actual knowledge of wrongdoing by defendants' subordinates).

Second, Plaintiff has failed to plead facts that Mr. Rodríguez had the power, ability, right, or basis to intercede in a criminal investigation and direct (or attempt to influence) prosecutors, witnesses, or the complainant's employer to withdraw charges. Not only did Mr. Rodríguez lack authority to do so, he lacked first-hand information and evidence upon which to draw any definitive conclusion, and he lacked any mechanism to act. Neither the TAC nor the Response offers any explanation or authority on how Mr. Rodríguez was to assess witness credibility, examine the evidence in Cook County's possession, and make a judgment on whether Plaintiff should be prosecuted, let alone involve himself in Cook County's prosecutorial discretion.

Indeed, it is unclear what Plaintiff wanted Mr. Rodríguez to do and how Mr. Rodríguez's purported failure to act rises to a cause of action. Plaintiff now says that he is not arguing that Mr. Rodríguez should have "improperly influence[d] the assigned Assistant State's Attorney." (Resp. at 29) Instead, he says Mr. Rodríguez "should have reached out to Monterrey Security, Defendant Ortiz's employer *to ask why* Ortiz was continuing to accuse Plaintiff of battering him

when cellphone video and security camera footage demonstrated that Plaintiff did not batter Ortiz." (*Id.* at 29, 4 (emphasis added)) The allegation cited by Plaintiff, TAC ¶ 159, says nothing about how Mr. Rodríguez should have reached out to Monterrey Security to "ask why" one of its employees was continuing to accuse Plaintiff. The TAC directly alleged, on the other hand, that Mr. Rodríguez joined the conspiracy "[b]y failing to provide security camera video footage to the Cook County State's Attorney's Office in response to a subpoena request." (TAC ¶ 172) In his Response, Plaintiff retreats from that allegation, likely because Mr. Rodríguez was never issued any such subpoena from the Cook County State's Attorney's Office.[9]

The TAC also alleged that Mr. Rodríguez should have "contact[ed] the Cook County State's Attorney's Office to inform the assigned Assistant State's Attorney that Plaintiff was being wrongfully prosecuted." (*Id.* ¶ 157; Resp. at 8) Plaintiff does not explain how Mr. Rodríguez (as opposed to Plaintiff's counsel who allegedly had exculpatory videos) "asking [Monterrey Security] why" one of its employees was pursuing criminal charges would have caused them to recant. (TAC ¶¶ 197-99) Moreover, the TAC demonstrates that "Monterrey Security contracts with the Village of Bridgeview," not the Fire or Mr. Rodríguez. (*Id.* ¶ 5) Similarly, Plaintiff omits any explanation of what Mr. Rodríguez was supposed to do with the State's Attorney's Office other than "contact" the assigned prosecutor. Plaintiff also fails to explain how Mr. Rodríguez's assessment of the video—especially without the benefit of the police's or prosecutor's file, experience, training, or authority—was relevant to the witnesses, police, prosecutors, or even the court. In short, his "failure to intervene" claim against Mr. Rodríguez is an entirely fabricated cause of action and not based on any law, facts, or common sense.

---

[9] In fact, Plaintiff retreated from all of his allegations related to subpoenas in the Response. Tellingly, Plaintiff did not attach any subpoena to the TAC or the Response, or any evidence of a motion to compel, court order, or any failure to comply with a subpoena by Mr. Rodríguez.

Plaintiff, however, argues that Mr. Rodríguez's "argument obfuscates well-established law – that private citizens may violate the Constitution or commit the tort of malicious prosecution if they cause charges to be brought or continued against an innocent person." (Resp. at 29) Plaintiff is wrong so it is unsurprising that he cites no case to support this "well-established law." The cases Plaintiff cites for this proposition did not have any "private citizen[ ]" defendants and both affirmed dismissal. *Snodderly v. R.U.F.F. Drug Enf't Task Force*, 239 F.3d 892, 894 (7th Cir. 2001) (defendants were the City of Chicago and Chicago Police officers); *Reed v. City of Chicago*, 77 F.3d 1049, 1050 (7th Cir. 1996) (defendants were police officers, an inter-district drug enforcement task force, and Indiana municipalities).

As for § 1986, it only applies to conspiracies to violate the constitutional rights identified in § 1985; the statute does not "create a cause of action for a conspiracy to deny due process." *Ruiz v. Kinsella*, 770 F. Supp. 2d 936, 943 (N.D. Ill. 2011); *cf. Chatman v. City of Chicago*, No. 14 C 2945, 2018 WL 1519160, at *10 (N.D. Ill. Mar. 28, 2018) ("Pursuant to *Brady*, the government violates the Due Process Clause of the Fourteenth Amendment when it fails to disclose evidence materially favorable to the accused. The duty to disclose extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor.") (internal citations and quotation marks omitted). As the Court is well aware, *Brady* has nothing to do with the facts alleged against Mr. Rodríguez despite the TAC's attempt to shoehorn that jurisprudence into the facts of this case. (TAC ¶ 30)

The only other case that Plaintiff cites stands for the unremarkable and irrelevant proposition that *law enforcement officers* can be liable under § 1983 if they "(1) had reason to know that *a fellow officer* was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Campbell*, 2018 WL

13

4352614, at *5 (emphasis added). As stated in *Melongo v. Podlasek*, however, a private citizen like Mr. Rodríguez can be liable for malicious prosecution—a state crime—only if he "*initiated* a criminal proceeding or [his] participation in it [was] of so *active and positive* a character as to amount to advice and cooperation." No. 13 C 4924, 2019 WL 1254913, at *18 (N.D. Ill. Mar. 19, 2019) (emphasis added). Plaintiff does not plausibly allege that Mr. Rodríguez did either. In fact, Mr. Rodríguez is accused of not being active enough. (TAC ¶¶ 296, 301)[10] In the context of the federal civil rights statutes, Plaintiff must show far more: "that the misuse of the legal proceedings is so egregious as to subject an individual to deprivation of a constitutional dimension." *Ford v. City of Rockford*, No. 88 C 20323, 1992 WL 309603, at *7 (N.D. Ill. Oct. 15, 1992). Plaintiff cannot meet this heavy burden.

**D.     Plaintiff fails to plausibly allege any of the elements of Intentional Infliction of Emotional Distress ("IIED").**

Plaintiff does not address *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30 (1997), which forecloses his IIED claim. *Id.* at 39-40 (holding that "the fact that a private complainant lacks the power to preempt the discretion of the prosecutor" means that "any omission in failing to inform the prosecutor of newly discovered information . . . would arguably, at best, constitute passive conduct that by its very nature could not rise to the level of outrageous conduct"); *see also*

---

[10] Compare the facts of this case with *Melongo*, in which the private defendant: "initiated the criminal proceedings by making the complaint to the [police] […] She attempted to get the State's Attorney personally involved in the investigation. […] She contacted third parties seeking information to attempt to 'increase [plaintiff's] charges,' allegedly at [the defendant ASA's] request. She attempted to file additional charges against [plaintiff] for issues with messages disappearing from her Blackberry. […] She repeatedly sought to have [plaintiff's] website taken down, and several months later, [defendant police officers and ASA] investigated and charged [plaintiff] with eavesdropping, resulting in the website going offline. […] [Defendant] continued to complain about [plaintiff] to other individuals, including a reporter and a state senator. […] And, she testified at the computer-tampering trial. From this evidence, a reasonable jury could conclude that [defendant] was actively involved in the criminal proceedings against [plaintiff] between 2006 and 2014." 2019 WL 1254913, at *18. Mr. Rodríguez, in stark contrast, is accused of wrongdoing precisely because he did *not* insert himself in the middle of a criminal investigation and prosecution.

*Duffy v. Haberkorn*, 2012 IL App (1st) 110841-U, ¶ 22 (affirming dismissal where plaintiff alleged that defendant filed false police reports resulting in plaintiff being "stripped of his police powers during the pending investigation") (unpublished opinion).

Plaintiff again relies on case law applicable to law enforcement officials as applying to Mr. Rodríguez in his IIED argument. He cites *Chatman*, in which this Court considered the case of a plaintiff who spent over a decade in prison for a sexual assault he did not commit. 2018 WL 1519160, at *1. At the time of his trial, a defendant law enforcement official knew of but did not disclose a memo unknown to plaintiff that would have likely "had the power to free an innocent man." *Id.* at *20. This Court found that could reasonably be seen as an "abuse[ ] of power and authority," and that plaintiff "experienced severe emotion distress by spending over a decade in prison for a crime he did not commit." *Id.* Suffice it to say, Plaintiff's case is not *Chatman*. Here, Plaintiff's Counsel had access to the videos he claims were completely exonerating—presumably he made those available to the State's Attorney's Office—and Mr. Rodríguez is not a law enforcement official who can similarly abuse the power and authority of that position.

**III. Conclusion.**

Nelson Rodríguez respectfully requests entry of an order dismissing all claims against him with prejudice.

| | |
|---|---|
| R. Matthew Hiller<br>Kenneth L. Schmetterer<br>Devin Carpenter<br>**DLA PIPER LLP (US)**<br>444 West Lake Street, Suite 900<br>Chicago, Illinois 60606<br>312-368-2198/2176/2149<br>matt.hiller@dlapiper.com<br>kenneth.schmetterer@dlapiper.com<br>devin.carpenter@dlapiper.com | Respectfully submitted,<br>NELSON RODRÍGUEZ<br><br>By: /R. Matthew Hiller<br>    One of his attorneys |